688 A.2d 955

**In re MATTHEW R.**

**No. 846, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 6, 1997.

Martha Weisheit, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Paul Zamuda, Bethesda, on the brief, for Eugene R.

■■■■■■

Bernard Cooney, Silver Spring, on the brief, for Matthew R.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before CATHELL and THIEME, JJ., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

CATHELL, Judge.

Rebecca R. appeals from an order of the District Court for Montgomery County, sitting as a Juvenile Court, rendered in a Child in Need of Assistance (CINA) proceeding, that directed that she authorize the release to the Montgomery County Department of Social Services (MCDSS), appellee, of her records pertaining to her past diagnoses and treatments for mental or emotional disorders. She asserts that the order was improper because of the privileged nature of those records.

In relevant part, Md.Code (1974, 1995 Repl.Vol.) § 9–109 of the Courts and Judicial Proceedings Article (CJ) provides:

> In *all* judicial ... proceedings, a patient ... has a privilege to refuse to disclose and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder.... There is no privilege if ... [i]n a civil or criminal proceeding ... [t]he patient introduces his mental condition as an element of his ... defense.... [Emphasis added.]

In the case at bar, the trial court's sua sponte order, in relevant part, provided:

> But I will order both Mr. and Mrs. R. to authorize the Department in writing to get all medical records and medical opinions from the Springfield Hospital and from all persons treating or who treated [them] in the past....

Appellant's counsel, at the first opportunity, requested that the court reconsider:

MS. LONG: ... I would just ask ... as a legal matter that you reconsider.... I don't believe, Your Honor ... has authority to order her to do that....

. . . .

COURT: Well, the point is if she [does not] want to do it she's in California and I'm over here. What am I going to do? Send somebody for her? *What I'm really trying to say by ordering it is that I consider it very important.* I'm going to let the order stand *but it's up to her if she wants to do it or not.* [Emphasis added.]

The trial judge was then interrupted by appellant and the following transpired:

MRS. R: I have a lengthy psychiatric history related to many different issues.

. . . .

... I'd be more than willing to do an independent evaluation but I'm not going to have an evaluation tainted by old documents in my past which is changed....

COURT: Well, the point is that you can show that it's changed....

. . . .

... I think the Court's entitled to know the background of ... your background. We just can't cut your background off from you. But you're certainly entitled to show that you've gotten help, that you're a different person.

While it is not altogether clear that the trial court intended its order to be mandatory, it is clear that appellant's trial counsel and appellant vigorously asserted the statutory privilege. It is absolutely clear that the waiver that the Montgomery County Department of Social Services now asserts to us on appeal was never raised by it, asserted by it, proffered by it, or, in any way brought to the trial court's attention, and it is equally manifest that the trial court never found a waiver of the privilege, either expressly or by implication.

Appellant presents this question on appeal:

Does the psychotherapist-patient privilege bar discovery of a parent's prior psychiatric records in a CINA proceeding, even though the parent's psychological fitness to care for her child is at issue?

While we shall ultimately answer that question, we stress now our emphasis on the statute's use of the words "*all* judicial ... proceedings"—"all" includes CINA proceedings. Before finally answering the issue posed, we perceive, however, another preliminary question:

Where the only basis for admissibility of privileged information is either an express waiver of the privilege under CJ section 9–109(6) or an implied waiver under [CJ] section 9–109(d)(3)(i), may a trial court order a party to produce privileged information when that information is not directly requested and where the privilege is plainly asserted and there is no proffer made by the other party or any finding made by the trial court that the privilege has been waived?

We answer our preliminary question in the negative. We explain.

We initially note the provisions of two Maryland Rules. Maryland Rule 5–301, **Presumptions in Civil Actions**, provides that "a presumption imposes on the party against whom it is directed the burden of producing evidence to rebut the presumption." Maryland Rule 5–104, **Preliminary Questions**, states:

Preliminary questions concerning ... the *existence of a privilege* ... shall be determined by the court.... In making its determination, the court may, in the interest of justice, decline to require strict application of the rules of evidence, *except those relating to privilege* and competency of witnesses. [Emphasis added.]

■ Appellee cites *In re Vanessa C.*, 104 Md.App. 452, 460, 656 A.2d 795 (1995), for the proposition that the error in admitting the records was harmless. Appellee argues that appellant "does not assert that she has complied with the order, nor that she has been threatened with a contempt proceeding for noncompliance." We disagree. Appellant has

refused to execute a release for the records. If appellee's harmless error arguments were to be accepted by us, a patient would have absolutely no recourse prior to refusing to obey the court's order and risking contempt sanctions. The risk in refusing to comply, even if the court acknowledges little actual power to enforce because appellant is not within this jurisdiction, exists and continues to exist.

*In re Vanessa C.* is more relevant for its procedural discussion. We held there that it was error for the trial court to compel the production of a mother's psychiatric records. We explained:

> The initial hearing was conducted before Judge Harrington and was of short duration. One of the few things accomplished at that time was the acceptance into evidence of the discharge summary of appellant's psychiatric records from Holy Cross Hospital. Initially, the court was reluctant to admit the records. The court was then informed that the records were released to DSS by the Crisis Center and that the Crisis Center had obtained the records from Holy Cross Hospital. It was argued that this amounted to a waiver. *Appellant's counsel objected to admission of the summary and insisted that appellant had the right to an evidentiary hearing with respect to whether the privilege was waived.* It appears that, while *DSS has the burden to show waiver,* the court did not require DSS to meet its burden prior to accepting the discharge summary.

> *Id.* at 460, 656 A.2d 795 (emphasis added).

In the present case, there was no evidentiary hearing on the waiver issue—it was not even presented below by appellee. The potential for harm remains. More relevant to our discussion of this issue was our clear holding in *In re Vanessa C.* that the party relying on a waiver of the privilege has the burden to show waiver. *Id.*

Another case involving whether a position taken by a person with a privilege (attorney-client privilege) constituted a waiver

was *Harrison v. State*, 276 Md. 122, 345 A.2d 830 (1975).[1] The defendant, Harrison, while on the witness stand, testified as to the content of a jail house conversation with another prisoner. On cross-examination, the prosecutor was permitted to ask Harrison if he had ever told his former attorney of the conversation. Harrison replied that he had. The trial judge then allowed the State to reopen its case and call Harrison's former attorney, over Harrison's privilege-based objection. Harrison's former attorney denied that Harrison had told him of the matter. Harrison's conviction was reversed. The Court of Appeals, after giving a concise history of the privilege, acknowledged that the existence of the relationship and whether the communication is privileged "in the first instance for the trial court." *Harrison*, 276 Md. at 136, 345 A.2d 830. The Court then commented that one of the State's positions was that the privilege "was waived by the appellant's responses to the prosecutor on cross-examination." *Id.* The Court, in addressing the issue, stated:

> Although waiver by implication is universally recognized and even though it need not be expressed in writing nor in any particular form, the intent to waive must, however, be expressed either by word or act, or omission to speak out. Once the confidential matter has been disclosed, it is no longer secret and the privilege which might be claimed disappears.
>
> . . . .
>
> Since a voluntary disclosure deprives a subsequent claim of privilege based upon confidentiality, and since traditionally waiver is described as the intentional relinquishment of a known right, in determining waiver by implication "regard must be had to the double elements that are predicated in

---

1. In *Waldron v. State*, 62 Md.App. 686, 699, 491 A.2d 595, *cert. denied*, 304 Md. 97, 497 A.2d 819 (1985), we, citing *Harrison v. State*, 276 Md. 122, 345 A.2d 830 (1975), stated that "once the confidential matter has been disclosed and is no longer secret, the privilege disappears." While that is generally correct, we held in *Waldron* that the issue regarding confidential communications had not been preserved for appellate review.

every waiver, *i.e.*, not only the element of implied intention, but also the element of fairness and consistency."

*Id.* at 137–38, 345 A.2d 830 (citations omitted).

In *Harrison*, the Court recognized a procedural problem similar to that in the case at bar:

Procedurally, we think [the trial court] erred in not conducting a preliminary inquiry out of the presence of the jury and hearing testimony of all the surrounding facts and circumstances to determine initially whether a confidential relationship existed between Harrison and [Harrison's former attorney], and if so, whether or not there had been a waiver of the privilege. It appears that the trial court required a disclosure of the communication without first determining the existence of the privilege.

*Id.* at 151, 345 A.2d 830.

Appellant, in the case *sub judice*, clearly invoked her privilege. Appellee did not assert below that the privilege had been waived, nor did the trial court make any finding of waiver. Additionally, the Department of Social Services, in one of its reports, noted that appellant declined to waive the privilege as to past records.

*Goldsmith v. State*, 337 Md. 112, 651 A.2d 866 (1995), involved attempts by a criminal defendant to obtain privileged information about a victim in pretrial criminal proceedings. The Court of Appeals noted that during a hearing on the motion to compel the production of certain documents, the defendant had made "no proffer of any likelihood that relevant information would be obtained by reviewing the records." *Id.* at 117, 651 A.2d 866. In the case *sub judice*, appellee not only failed to make a proffer of relevance at the hearing, but never moved to force the production of appellant's psychiatric records. As we have indicated, it was a *sua sponte* trial court initiative.

The *Goldsmith* majority commented on its holding in *Harris v. State*, 331 Md. 137, 626 A.2d 946 (1993), in which the

Court held, in reference to less protected confidential records,[2] that *"before disclosure* will be ordered, the moving party must show, usually at a hearing, some connection between the records sought, the issue before the court, and the *likelihood* that information relevant to the trial would be discovered." *Goldsmith,* 337 Md. at 127–28, 651 A.2d 866 (some emphasis added; citations omitted). The *Goldsmith* Court concluded that, in order to obtain pretrial discovery of even confidential records, a "defendant [had] to show a likelihood of obtaining relevant information." *Id.* at 128, 651 A.2d 866.

The *Goldsmith* Court went on to note that a criminal defendant's constitutional rights may outweigh a victim's right to assert a privilege and, therefore, privileged information could be obtained by a criminal defendant at trial. The Court, however, cautioned that

> [t]he mere assertion that the records in question *may* contain evidence useful for impeachment is insufficient to override an absolute statutory privilege, even at the trial stage. . . . We cannot permit a privilege to be abrogated even at the trial stage by the mere assertion that privileged records *may* contain information relevant to credibility. To do so would virtually destroy the psychotherapist-patient privilege of crime victims. It has long been recognized that privileges, by their very nature, restrict access to information which would otherwise be disclosed. The rationale for this restriction has been our recognition of the social importance of protecting the privacy encompassed by specified relationships. Such privacy interests cannot be negated by the mere assertion of the possibility of impeachment evidence.

*Id.* at 133, 651 A.2d 866 (citations omitted). The *Goldsmith* Court ultimately held

> that in order to abrogate a privilege such as to require disclosure at trial of privileged records, a defendant must

---

2. There is comment in the cases that "privileged" matters enjoy more protection than "confidential" matters.

establish a reasonable likelihood that the privileged records contain exculpatory information necessary for a proper defense. In the present case, the defendant did not establish the likelihood that the records sought would provide exculpatory information. At most, *Goldsmith* made only a speculative assertion that the records might be relevant for impeachment.

*Id.* at 133–35, 651 A.2d 866 (footnotes omitted).

The dissent in *Goldsmith*, written by Judge (now Chief Judge) Bell and joined by Judge Eldridge, although also basing its discussion on criminal cases, at least inferentially recognized the need for an adequate proffer. Judge Bell commented that in *Avery v. State*, 15 Md.App. 520, 292 A.2d 728, *cert. denied*, 266 Md. 733 (1972), *and appeal dismissed*, 410 U.S. 977, 93 S.Ct. 1499, 36 L.Ed.2d 173 (1973), it was noted that "[i]t is not clear from the court's opinion whether, other than a proffer that the records existed, the defendant proffered why he believed he was entitled to inspect the records." *Goldsmith*, 337 Md. at 146, 651 A.2d 866. The dissent then discussed that in *Avery* we, addressing a criminal defendant's request for a victim's psychiatric records, adopted the procedure suggested by the Court of Appeals in *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980), which discussed claims of executive privilege. Judge Bell noted that

[u]nder that procedure, once materials have been determined to be presumptively privileged, the burden shifts to the party seeking them to show either that they are not privileged or that there is some necessity for their production notwithstanding the privilege. Only when the requisite showing has been made to overcome the presumption will the court conduct an *in camera* inspection of the materials.

*Goldsmith*, 337 Md. at 147, 651 A.2d 866 (citation omitted).

■ The dissenters' argument in *Goldsmith* involved, to a large degree, the conflict between the privilege and a criminal defendant's constitutional right of confrontation. Their reasoning and discussion leads us to believe that, in a civil case, they would join with the majority in requiring that, when a

privilege, such as that implicated in the case *sub judice*, is asserted, the party seeking the privileged information has the burden of establishing that one of the exceptions to the respective statutory privilege exists. In order to rebut the claim of privilege with an argument of waiver, the argument *must be made to the tribunal* before whom the claim of statutory privilege has been asserted.

When the privilege clearly applies, as in the case *sub judice*, our position, that an assertion of privilege creates a presumption, necessitating the introduction or at least the proffer of evidence rebutting it, is buttressed somewhat by the Court of Appeals's discussion of the privileged confidential relationship between spouses in *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977). Therein, former Chief Judge Murphy noted:

> It is not necessary that the spouse claiming the privilege establish the confidential nature of the communication. Generally, the courts have presumed that communications between husband and wife are confidential and privileged, although the circumstances of a given case can negate this presumption. The presumption is rebutted where it is shown that the communication was not intended to be confidential, or was made to, or in the presence of a third party.

*Id.* at 543, 380 A.2d 49 (citations omitted).

In *Hamilton v. Verdow, supra,* discussed by Judge Bell in *Goldsmith,* the Court of Appeals established a procedure to be used by a court when addressing an executive privilege claim. The Court stated:

> [W]hen a formal claim of executive privilege is made, with an affidavit stating that the demanded materials are of a type that fall within the scope of the privilege, they are presumptively privileged even from *in camera* inspection. The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged.... Consequently, absent such a preliminary showing by the party demanding disclosure, the

claim of executive privilege should be honored without requiring an *in camera* inspection.

287 Md. at 566–67, 414 A.2d 914 (citations omitted). We later held, in *Reynolds v. State*, 98 Md.App. 348, 366, 633 A.2d 455 (1993), that "the procedure [above] established to resolve claims of executive privilege should also be applied to claims of privilege under C.J. [§] 9–109.... Records containing information about communications between the patient and the psychiatrist or psychologist are presumptively privileged."

In the case at bar, the judge *sua sponte* ordered disclosure. Appellant claimed the privilege. Appellee never objected below to the claimed privilege, nor proffered to the trial court the claim of waiver now made to this Court. A presumptive privilege cannot be rebutted when no one even claims it has been waived. Accordingly, we hold that the trial court's action in ordering appellant to disclose her past records was, for that reason, as well as those that follow, in error. We shall, however, because of the importance of the issue and the frequency with which social service agencies, and others, introduce the mental condition of opposing parties in litigation, address another reason for reversal and in doing so respond to the position taken by appellee to that important question actually raised by appellant in this appeal. We repeat appellant's question:

**Does the psychotherapist-patient privilege bar discovery of a parent's prior psychiatric records in a CINA proceeding, even though the parent's psychological fitness to care for her child is at issue?**

We initially emphasize again that the General Assembly made the statutory privilege applicable in *"all"* judicial proceedings, subject to certain exceptions. We next note that the subject matter of a document introduced in evidence by appellant was offered for the purpose of responding to appellee's claims as to appellant's mental fitness. To counter MCDSS's claim of mental unfitness, appellant's attorney, Ms. Long, on cross-examination of Mr. Williams, an employee of MCDSS, asked him if he had received a document dated

December of 1995 from a Dr. Powell. Williams responded
that he had reviewed the document. Thereafter, appellant's
counsel requested that the court admit "mother's exhibit
number one." It was then received in evidence. That exhibit
included the relatively recent letter from Dr. Powell dated
December 5, 1995, less than five months before the hearing.
In that letter, the following statements, relative to appellant's
mental and emotional state, were included:

> The patient currently suffers from bipolar illness....
> She has no paranoia, psychosis, suicidal ideation, or homicid-
> al ideation. Her motivation is good for continued care,
> medication compliance, and self-improvement.
>
> ... She is taking her medications regularly. She is
> aware of having her bipolar disorder.
>
> ... Her memory is normal. Her judgment and insight
> appear intact.
>
> ... [H]er illness appears stable at the moment.... She
> also is having no aggravation of her symptoms from season-
> al changes....
>
> Thus, for her further mental health stability I would
> encourage the court to at least consider "sponsored" visita-
> tion of her children.[3]

Dr. Powell's letter then recommended to the California court
that it consider ordering an evaluation of appellant "with the
children to further clarify the appropriateness of the visitation
or eventual custody." Appellee, relying on section 9–
109(d)(3)(i) of the Courts and Judicial Proceedings Article,
asserts that appellant's claim to be mentally fit for custody

---

**3.** Dr. Powell apparently was called upon by a California court to
conduct an evaluation of appellant. His letter was addressed to the
California judge then involved with custody matters relating to appel-
lant's three daughters in California. Appellant also offered in evidence
certain portions of the record of the California proceeding relative to
Dr. Powell's opinion. Maryland's statute also empowers a judge to
order current mental examinations and evaluations, and communica-
tions made during such evaluations are, in certain circumstances, not
privileged. *See* CJ § 9–109(d)(2). Appellant agreed to undertake a
current evaluation.

and this letter constitute the introduction of this mother's mental condition by her as an element of her claim. We shall address this issue more fully as we conclude our opinion.

Most of the cases addressing this privilege, or those closely related to it, are criminal cases. We first note again what Judge Chasanow wrote in *Goldsmith*, that the rationale for the privilege is the recognition "of the social importance of protecting the privacy encompassed by specified relationships." 337 Md. at 133, 651 A.2d 866. In addition to *Goldsmith*, we are guided in our resolution by a case involving the attorney-client privilege, *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979).

In *Pratt*, a defense attorney retained a psychiatrist to examine his client, who had entered an insanity plea to the charges against her. During trial, the State presented the testimony of that psychiatrist to rebut Pratt's insanity defense. Pratt's attorney objected to the testimony of that particular psychiatrist on the grounds that it violated the attorney-client privilege. The State asserted that "when Mrs. Pratt interposed a defense of insanity, she waived the privilege with respect to all statements she may have made to any medical expert, whether in her employ or in that of the State." *Id.* at 521, 398 A.2d 421 (footnote omitted). The Court commented in a footnote that the State's position was the equivalent of asking the Court to create a waiver of the attorney-client privilege, similar to that created by the General Assembly in section 9–109(d)(3)(i) of the Courts and Judicial Proceedings Article and asserted by appellee in the present case, *"if the patient introduces his mental condition* as an element of his claim or defense." [4] (Emphasis added.) Although *Pratt* involved the attorney-client privilege (the psychiatrist had been employed by the attorney), the Court, responding to the State's assertion that Pratt had waived the privilege by interposing "a defense of insanity," noted what appears to us to be equally true in respect to the case *sub*

---

**4.** Mrs. R. did not "introduce" her mental condition, the State did. She responded. We shall address this *infra.*

*judice.* It answered the question by commenting, "An additional consequence of the State's suggested waiver rule, if adopted by us, is that the defense, in essence, would be required to assist the prosecution in discharging its burden of proof." *Id.* at 524, 398 A.2d 421. The Court further opined:

> If, in its efforts to establish the mental responsibility of the accused following a plea of insanity, the State is permitted to utilize a psychiatrist hired by the defendant, both the defense attorney and his client will be inhibited from "consulting one or more experts, with possibly conflicting views, by the fear that in doing so [they] may be assisting the government in meeting its burden of proof on the [sanity] issue."

*Id.* (brackets in original). Similarly, in the case at bar, a mother's desire to seek psychiatric help in order to be a better mother, or remain a good mother, could be seriously inhibited if the records of diagnoses and treatment, which often would include information of the most sensitive nature, could be readily obtained whenever a state agency seeking to modify or terminate that parent's rights to her children alleges that she is unable to care for them properly due in part to a mental or emotional problem. Moreover, if one parent in a custody dispute could, by challenging the other parent's mental fitness, get access to the other parent's records by his or her response to the allegations, the privilege would be meaningless.

In *Goldsmith,* Judge Chasanow, after opining that "[b]ecause of the privileged nature of the records involved in the present case, the burden of proof required of the [opposing party] defendant to establish a need for disclosure may be higher than that required in *Zaal* [*v. State,* 326 Md. 54, 602 A.2d 1247 (1992) ]," stated:

> In [*Commonwealth v.*] *Two Juveniles* [397 Mass. 261, 491 N.E.2d 234 (Mass.1986) ], the Supreme Judicial Court of Massachusetts ... recognized that "[i]n general, an assertion that inspection of information is needed only for a possible attack on credibility has been rejected because, if upheld, such a broad right of discovery would substantially destroy the privilege." In [*Commonwealth*] *v. Clancy,* [402

Mass. 664] 524 N.E.2d 395 (Mass.1988), the ... Court ... further clarified:

> "the individual seeking to override the privilege of anoth-er bears the burden of establishing a legitimate need for the privileged information sought...."

337 Md. at 132, 651 A.2d 866.

In the case *sub judice*, appellee argues on appeal, although it did not do so below, that because appellant claimed to be mentally and emotionally fit to supervise, raise, or visit with her children, it had a right to inspect her privileged past records to help determine the validity of her assertions. It, therefore, at least in part,[5] would have been seeking the information (if it had sought the information in the actual court proceeding as opposed to mentioning it in a report) for the potential purpose of impeaching her assertions and coun-tering the more recent report as to appellant's then present condition, such as Dr. Powell's report, and any future evalua-tions appellant agreed to undergo so long as her privilege was not breached. We repeat what Judge Chasanow stated in *Goldsmith:*

> We cannot permit a privilege to be abrogated even at the trial stage by the mere assertion that privileged records *may* contain information relevant to credibility. To do so would virtually destroy the psychotherapist-patient privilege of crime victims. It has long been recognized that privi-leges, by their very nature, restrict access to information which would otherwise be disclosed. The rationale for this restriction has been our recognition of the social importance of protecting the privacy encompassed by specified relation-ships.

337 Md. at 133, 651 A.2d 866 (citation omitted).

The appellee relies extensively on our decision in *Reynolds v. State*, 98 Md.App. 348, 633 A.2d 455 (1993). We initially

---

**5.** We recognize that they also sought access to the records in order to ascertain independently her mental and emotional condition. As we shall discuss later, in that regard the legislature has created the exemp-tion it deems appropriate.

note that the Court of Appeals's decision in *Goldsmith, supra*, appears to some degree to conflict with some of our determinations in Reynolds. It, like Reynolds, was a criminal case in which the privilege conflicted with a criminal defendant's constitutional right to confrontation. The present case is not a criminal case and a criminal defendant's constitutional right to confrontation is not involved.[6] Moreover, in *Reynolds*, although we held that the signing of a release to permit the prosecutors to review the records did not constitute a waiver, we held that, when the prosecutor introduced the hospital records, it constituted an "unqualified waiver" in regard to the hospital records, and, therefore, the victim had completely waived the privilege as to those records. 98 Md.App. at 363–64, 633 A.2d 455.[7] In *Reynolds*, we noted that, in criminal cases, in which a constitutional right to confrontation exists, the correct procedure would be that adopted by the Court of Appeals in *Hamilton v. Verdow, supra*. While, when we wrote *Reynolds, Hamilton* appeared to state the correct procedure, that may no longer be so. *See Goldsmith, supra*. The dissent in *Goldsmith* relied in part on our reliance on *Hamilton* in *Reynolds* and the *Goldsmith* majority mentioned neither Reynolds nor Hamilton. We need not resolve the conflict between these cases (even if we were capable of it) in light of our ultimate determination.

We emphasize again that *Reynolds* (and *Goldsmith* for that matter) arise out of the conflict between statutory privileges and a criminal defendant's constitutional right to confront witnesses. In the case *sub judice*, we are faced with the statutory privilege alone, unaffected by any exigency to re-

---

**6.** In *Goldsmith*, the majority, while journeying to the state courts of Connecticut, Nebraska, Michigan, Massachusetts, Colorado, and the federal courts, did not address Judge Murphy's (now Chief Judge) scholarly treatment of the interplay between a criminal defendant's right of confrontation and a party's claim of privilege in *Reynolds*. The dissenters in *Goldsmith* made that journey.

**7.** Appellant, by utilizing Dr. Powell's letter, may have, if waiver had been properly asserted, waived her privilege as to the records utilized by Dr. Powell in formulating his opinion.

solve a conflict of constitutional dimension arising out of the other party's constitutional rights. Montgomery County Department of Social Services has no constitutional right of confrontation. As we shall indicate, the mother's, not appellee's, constitutional rights are at issue. Because the party with the privilege, rather than the party seeking to breach it, has the constitutional right at issue here, we are able to piece together a policy in the more tailored manner of addressing a privilege alone. We mention the constitutional rights of appellant in order to note their importance. But first we need to determine the underlying type of action here involved.

The immediate issue of privilege arises out of a review hearing in respect to continued commitment of Matthew with, or through, the MCDSS. During this hearing, the order complained of was made. Appellant's primary focus appears to have been on her right to visit with Matthew. As far as we can discern from both sets of docket entries,[8] a CINA petition was first filed in December of 1994. It contained certain comments that we shall discuss, *infra*. Ultimately, an adjudication hearing was held. It reaffirmed previous orders (orders not contained in the record before us). Subsequently, another adjudication hearing was held on January 18, 1996 [sic] (apparently January 18, 1995). In that hearing, the court ordered suspension of appellant's visitation. Another adjudication hearing was then held in February of 1995. It reaffirmed several prior orders. Then, on July 17, 1996, another adjudication hearing was held before yet another judge. That judge then found Matthew to be a child in need of assistance and committed Matthew "to the Montgomery County Department of Social Services for placement in foster care, visitation with the parents under 'the direction and supervision of MCDSS.' EXHIBITS #1 and #2, STIPULATION OF FACTS RECEIVED BY COURT." A disposition hearing

---

**8.** The photocopied docket entries contained in the extract contain different and additional entries from the docket entries contained in the record. The extract indicates that another CINA petition was filed in April of 1995. The record contains neither the docket entry nor the petition.

was subsequently held on August 31, 1995. The commitment to MCDSS was continued. The court directed that the parents could have visitation "at the discretion and under the supervision of MCDSS." On March 7, and then again on March 15, 1996, review hearings were held. The court continued the commitment to MCDSS and then entered the orders that are the subject of this appeal.

At the March 15, 1996 review hearing, appellant "request[ed] that the case be transferred." Appellee objected. Appellant's counsel argued, "She would like the child removed to California. That's where she's living." The father of the child agreed to the mother's position. The child's attorney, although objecting to the mother's position, appropriately framed the issue: "The mother is essentially [requesting] a change in foster care from Maryland to California." The mother had created a minimal flower-selling business in California and provisions for extremely basic housing in the jurisdiction in which her other three children were already being supervised by the California courts.

While there were several other issues asserted at that last review hearing, the primary issue was that the mother desired to have Matthew transferred to California where she lived. We, however, do not need—and essentially cannot review the appropriateness of the trial court's order on that issue, as it was not appealed to us. We note, however, that at an appellate glance, it appeared to be appropriate. The only matter appealed to us was the correctness of the trial court's order directing appellant to release her medical records. The underlying matter, however, involves the "commitment of Matthew to the MCDSS for foster home placement." Section 3–801(h) of the Court's and Judicial Proceedings Article defines "commit" as "means to transfer legal custody." Accordingly, the review hearing did involve a custody matter, even though that issue was not appealed.

Appellant's parental rights are of constitutional dimension. Transfers of legal custody and changes in visitation involve

parental rights. We noted in *Wagner v. Wagner*, 109 Md.App.
1, 25, 674 A.2d 1, *cert. denied*, 343 Md. 334, 681 A.2d 69 (1996):

> [T]o be entitled to the protection of procedural due process,
> an individual must have a property or liberty interest
> warranting protection by the Fourteenth Amendment. Ms.
> Wagner, as a parent, has a protectible liberty interest in the
> care and custody of her children and when a state seeks to
> affect the relationship of a parent and child, the due process
> clause is implicated. [Citations omitted.]

We also noted that "[t]he right to rear one's child has been
deemed to be 'essential,' and encompassed within a parent's
'basic civil rights.'" *Id.* at 37, 674 A.2d 1 (citations omitted).

In *M.L.B. v. S.L.J.*, —— U.S. ——, ——, 117 S.Ct. 555, 564,
136 L.Ed.2d 473 (1996) (citations omitted; footnotes omitted),
the Supreme Court recently opined:

> Choices about marriage, family life, and the upbringing of
> children are among associational rights this Court has
> ranked as "of basic importance in our society[.]" ...
> M.L.B.'s case, involving the State's authority to sever per-
> manently a parent-child bond, demands the close consider-
> ation the Court has long required when a family association
> so undeniably important is at stake.

The Supreme Court subsequently noted that although the
Court had been divided in some respects in certain prior
cases, it had been

> unanimously of the view that "the interest of parents in
> their relationship with their children is sufficiently funda-
> mental to come within the finite class of liberty interests
> protected by the Fourteenth Amendment.... It was also
> the Court's unanimous view that few consequences of judi-
> cial action are so grave as the severance of natural family
> ties."

*Id.* at ——, 117 S.Ct. at 565 (citations omitted).

Thus, the question is: When an assertion of mental or
emotional parenting limitations is made by a state agency
seeking to maintain custody of a child contrary to that par-
ent's constitutional rights to raise or visit with her child, does

that mother, by filing a present mental evaluation in order to defend herself against the allegations made by a social services agency, "introduce[ ][her] mental condition as to an element of [her] claim or defense?" CJ § 9–109(d)(3)(i). We shall hold that she does not. We explain.

### Appellee's Petition

Appellee, Montgomery County Department of Social Services, in its petition below, alleged, in part:

> Mr. and Mrs. R are not able to provide ordinary and proper care and attention for M at this time.... [B]oth Mr. and Mrs. R have a history of emotional [weakness]; ... Mrs. R admitted to recent suicidal ideation.
>
> ... Greentree Shelter staff advised that ... Mrs. R reported that she experienced suicidal ideation ... she subsequently sought assistance at Shady Grove Hospital.... Greentree shelter staff also advised that Mrs. R reported that she had a history of mental illness....
>
> Investigation ... noted that the Crisis Center and Emergency Services staff noted concern about Mrs. R's emotional stability.... Concern was also noted that ... Mrs. R had been unwilling to participate in evaluations to determine [her] need for mental health services although Mrs. R acknowledged her history of emotional problems and her recent suicidal ideation.
>
> ... Concern was noted in 1988 regarding the emotional well-being of ... Mrs. R.... Investigation at that time noted that Mrs. R had a history of mental illness; that she had experienced a post-partem psychosis and required inpatient psychiatric care.... [T]he family came to their attention in 1992 when Mrs. R experienced another post-partem psychosis and required hospitalization.

On appeal, appellee asserts that appellant introduced her mental condition as part of her claim or defense. We dis-

agree.[9]  It is overwhelmingly clear that appellee "introduced" appellant's mental condition when it initially sought a transfer of custody of Matthew and sought to maintain that transfer of custody.  Appellant merely responded to that *introduction.* The specific issue to be resolved is, therefore, does such a response constitute the introduction of appellant's mental condition? [10]  We note again that appellant is protecting or asserting a constitutional right when she defends or participates in an action filed against her interests in respect to transfer of custody or visitation.  The position asserted by appellee would, under these circumstances, force a mother to help the Montgomery County Department of Social Services defeat her constitutional right to visit or otherwise assert a mother's interest in the placement of her own children.

The privilege as to the psychotherapeutic records of a patient was first established by the enactment of Chapter 503 of the laws of 1966.[11]  As enacted, it then included an exception providing that the presiding judge could "compel such disclosure" in child custody cases, if the trial judge considered disclosure to be "necessary to a proper determination of the issue of custody."  1966 Md. Laws, Chap. 503.  It also then included the exception at issue in this case.  The exception as to "custody matters" remained in the statute through the 1973 Special Session when Chapter 2 consolidated many statutes into the Courts and Judicial Proceedings Article.  Thereafter, the Legislature eliminated the custody exception in 1977.  See 1977 Md. Laws, Chap. 684.  With the exception of some

---

9.  There was, at one point, a stipulation filed as to appellant's then mental condition that contained statements relative to appellant having chronic mental health problems.  It was filed while appellant was, in fact, in a mental institution and was not executed by her but by her attorney.  Its sole purpose was for "a basis for a finding of CINA."

10.  Appellee relies mainly on the exception section 9–109(d)(3)(i) of the Courts and Judicial Proceedings Article.

11.  Lynn McLain, *Maryland Evidence* section 504.1 states that "Since 1963, however, Maryland has had a [the] statutory privilege. . . ."  We have been unable to find any statute creating the privilege prior to the enactment of Chapter 503 in 1966.

definitional modifications in 1981, the statute has remained unchanged since 1977.

The exception that permitted a trial judge to waive the privilege in custody cases, which, incidentally, is almost the equivalent of what occurred here, was repealed by Chapter 685 of the Laws of 1977. The proceedings in respect to that repeal, while certainly not conclusive as to legislative purpose, indicate that the Legislature did not accidentally remove that judicial power. Senator Curran, now the Attorney General, then the chairman of the Judicial Proceedings Committee, solicited input from several judges. In a letter to those judges, Senator Curran, writing for the Judicial Proceedings Committee, noted that "[w]e understand the need to encourage a full and frank discussion *between the patient and the psychiatrist, and want to enact laws to meet this end.*" (Emphasis added.) The bill file contains a letter to Senator Curran from a former colleague of ours, the late Honorable Solomon Liss. In that letter, Judge Liss opined:

I would be reluctant to urge compelled disclosure except as a last resort. Such an edict is not fair either to the professional person involved nor to his patient, who should be able to speak frankly without fear of disclosure.

Senator Curran also received a response from the Medical Service of the Supreme Bench of Baltimore (now the Circuit Court for Baltimore City). In that letter, Dr. Jonas Rappaport stressed the importance of protecting full and frank disclosure between patients and their physicians, noting instances in which doctors had had "extreme difficulty" in working with "parents in psychotherapy" when those parents were informed that what they, the parents, said or did in psychotherapy could be brought out in court in custody cases. He noted that several other doctors had proffered that the exception prevented needy parents from obtaining treatment and that the exclusion "may eventually place the children at a disadvantage. If their parents cannot be 'cured,' then the child continues to be exposed to an emotionally disturbed parent." Dr. Rappaport concluded by furnishing his opinion that

the benefits to society of having confidential and privileged treatment available to troubled parents far outweighs the limitations placed upon the court by not having such information revealed against the parents' wishes.

We realize that an after the fact review of notes in the "bill file" of a statute is somewhat tenuous in respect to establishing legislative purpose. Even with this limitation, however, we at least know that the Committee's purpose was "to enact laws" promoting "a full and frank discussion between the patient and the psychiatrist." We also know that the Legislature eliminated the very exception that may, under a broad interpretation, have permitted the trial judge's actions in the case *sub judice.*

Considering that the Committee's comments and solicitations, as well as the responses it received in 1977, were in connection with removing an exception that empowered judges to force parents to disclose their mental records when involved in custody disputes, we find it difficult to perceive the existence of any legislative purpose or intent that a judge should have that power when a state agency initiates and maintains an action to commit, *i.e.,* change the legal custody of a child, which could result in divesting both parents of certain parental rights. Because we perceive a strong legislative interest in preserving the psychiatrist-patient privilege, we shall construe the exception in section 9–109(d)(3)(i) of the Maryland Courts and Judicial Proceedings Article, so as to preserve the privilege as opposed to destroying it.

■ We hold that the section 9–109(d)(3)(i) exception does *not* apply when the opposing party, in this case, the Montgomery County Department of Social Services, "introduces" the patient's mental condition and the patient is merely responding to the Department's claim. To hold otherwise could create absurd results in many instances. Were we to hold as appellee suggests, that the opponent of a person who has been a psychiatric patient, who has sued that person in any type of action and alleged a deficient mental condition, could force that patient either to admit the assertion by not denying it or

waive the statutory privilege by denying the contentions of the other party. This could apply even though the agency bears the ultimate burden of proving a need to change a child's custody. It would also apply to other custody disputes, tortious actions in which a proponent alleges a mental deficiency on the part of the other party, and perhaps other actions as well. To adopt the interpretation suggested by appellee would virtually empower that agency to ignore the privilege in any case in which it presents allegations of a mother's or father's mental instability.

Our combined judicial experience suggests that this type of allegation by such agencies is not infrequent. Were we to legitimize appellee's positions by adopting them, the result would virtually abolish the privilege in CINA and other parental right cases involving the various social service agencies in this State. If this privilege is to be abolished, that function should be for the legislative branch, in that this privilege is its creature, not ours. This is especially true where it is shown, as here, that the legislative branch has abolished the provision that formerly permitted judges in custody cases to require the production of such records, in order, according to the Committee Chairperson, to "encourage a full and frank discussion" between patient and psychiatrist. We hasten to add, however, that what we have said should not be construed to indicate that we believe, or do not believe, that an exception should be made in these types of cases in which the best interests of the children would be well served by such an exception. What we mean to say is that question is for the Legislature that imposed the privilege in the first instance. The Legislature has available to it a much broader range of resources to draw upon in order to determine what the State's policy should be in such cases.

We shall now resolve the remaining sub-issue: Does a litigant completely waive the privilege when she, forced to respond to an agency's assertion of her mental problems or risk losing certain rights to her children, responds by furnishing a relatively current letter as to her present condition? Obviously, those cases we have discussed heretofore do not

answer, or even suggest the answer, in cases containing the circumstances here present. We, therefore, fashion a rule to apply until, and if, the Court of Appeals or, preferably, the legislative branch, clarifies the matter.

We hold that in cases in which a litigant's mental condition is *introduced* by the opposing party and the litigant responds with a denial supported by a limited medical record asserting a present condition and where an attorney enters into a stipulation such as that in the case *sub judice* for an institutionalized client, the waiver of the privilege is limited to the record offered by the litigant and the testimony of the person producing the record and to any record that is included as a part of the stipulation. Under these circumstances, there is no *carte blanche* waiver of the privilege as to past records, communications, and treatment predating that evidence proffered to defend against the opposing party's claim.

We have fashioned a holding to apply in respect to a specific exclusion, section 9–109(d)(3)(i), under somewhat limited circumstances. We respectfully suggest, however, that either the Court of Appeals or the General Assembly should consider this matter anew. In stating this, we recognize the *Goldsmith* holding—and the dissent's position in that case. The resolution of these privilege issues in criminal cases, however, seems invariably to be connected with a defendant's right to the privileged records of others based on his constitutional rights to confrontation and not as here, a defendant's (respondent's) assertion of the privilege in order to help her defend her constitutional right to parent her child. The cases, therefore, are not, with absolute clarity, applicable. We perceive that in civil cases involving important matters relating to the well-being of children, especially those cases involving an agency's introduction of the mental condition of a parent, at least the Court of Appeals's imprimatur would be helpful.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**