747 A.2d 736

**In re ALETHEA W.**

**No. 6879, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 7, 2000.

636

Margaret L. Lanier, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee, Dept. of Social Services.

Joan Dudley, Rockville, on the brief, for appellee, minor child.

Submitted before MURPHY, C.J., and WENNER and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

MARVIN H. SMITH, Judge, Retired, Specially Assigned.

The District Court of Maryland for Montgomery County, sitting as the juvenile court, adjudicated Alethea W., the daughter of appellant Linda W., to be a Child in Need of Assistance. The only issue in this appeal from that adjudication is whether the trial court erred in admitting testimony and documentary evidence regarding two competency examinations of Linda W. that were performed at Crownsville Hospital Center pursuant to court orders in two unrelated criminal cases. We shall hold that the court did not err.

## FACTS

Alethea W. was born on July 22, 1998. Five days later, during the evening of July 27, Linda W. called the Montgomery County Department of Health and Human Services Crisis Center in an effort to secure shelter for herself and Alethea.

Nikia Miller, a therapist at the Crisis Center, arranged for a cab to bring Ms. W. and the baby to the Center. Once Ms. W. and Alethea arrived at the Center, Ms. Miller observed that Ms. W. "appeared psychotic" and "appeared to be responding to some internal stimuli."

Ms. Miller called the Department's Child Protective Services office, and representatives of that office, including social worker Teresa Kingsfield, arrived at the Crisis Center to assist her. Ms. Miller prepared an emergency petition to have Ms. W. undergo a psychiatric evaluation at Shady Grove Hospital.[1] Ms. Miller then called the police, who served the petition on Ms. W. while she waited at the Crisis Center. The police transported Ms. W. to the hospital.

Teresa Kingsfield, meanwhile, prepared an emergency petition for shelter care for Alethea. The petition was filed in the juvenile court and granted the next day. The court directed that Alethea remain in the care and custody of the Montgomery County Department of Health and Human Services and that she be placed with her maternal great-aunt, Arrah O.

On August 12, 1998, Ms. Kingsfield filed a second petition, this time asking that Alethea be declared a Child in Need of Assistance. A hearing was held over three days—November 12, 1998, January 5, 1999, and February 2, 1999. In order to prove that Alethea was a Child in Need of Assistance, the County called Ms. Miller, Ms. Kingsfield, social worker Barbara Geiger, and Arrah O. to testify. It also called Dr. Muhammad Ajanah, Associate Director of Forensic Psychiatry at Crownsville Hospital Center. Dr. Ajanah's testimony and two letters admitted through Dr. Ajanah are the subject of this appeal.

Dr. Ajanah heads a forensic team at Crownsville. He told the court that Linda W. had twice been evaluated by the team to determine her competency to stand trial in criminal cases unrelated to the instant case. The District Court of Maryland

---

1. Evidence regarding the evaluation at Shady Grove was apparently not offered at the hearing and is not in issue in this appeal.

for Prince George's County first sent Ms. W. to Crownsville for a competency evaluation on October 22, 1996. Ms. W. refused to cooperate with the forensic team, however. Dr. Ajanah explained that, because Ms. W. would not submit to an evaluation, the team was forced to conclude preliminarily that she would not be able to participate in the criminal trial and that she was therefore incompetent to stand trial. As a result, Ms. W. was involuntarily committed to Crownsville on December 30, 1996. She was then forced to take medications which rendered her more cooperative, and the team was able to begin an evaluation process which concluded in February of 1997. The team then found Ms. W. competent to stand trial, and she remained at Crownsville until her trial on March 18, 1997.

Ms. W. was next admitted to Crownsville for a competency evaluation on October 7, 1998, while the petition now in issue was pending. Again, the team initially found Ms. W. to be incompetent to stand trial. Because Ms. W. was more cooperative this time and voluntarily took medications, she did not have to be involuntarily committed. The team was able to complete a full evaluation, during which it found Ms. W. competent to stand trial, by November 4, 1998.

Dr. Ajanah testified that he informed Ms. W. both times she was sent to Crownsville that anything she told the members of the team would not be "confidential." He further testified that the evaluation processes did not end shortly after Ms. W.'s arrivals at Crownsville but continued throughout her stays. Counsel for Ms. W. conceded that, under certain circumstances, communications between an individual and a psychiatrist or psychologist elicited pursuant to a court-ordered examination may not be privileged. She nevertheless argued that Ms. W.'s communications with Dr. Ajanah and the other members of the forensic team were privileged. The trial court rejected counsel's arguments, and Dr. Ajanah was permitted to testify in detail about the conclusions reached by the forensic team during both of Ms. W.'s hospitalizations at Crownsville. In addition, the two letters setting forth the

team's views at the start and end of Ms. W.'s first hospitalization were admitted into evidence.

Dr. Ajanah explained that, during Ms. W.'s first hospitalization at Crownsville, the team diagnosed her as having a psychotic disorder, or psychosis, but could not reach a more specific diagnosis. The team also determined that Ms. W. abused alcohol and had a personality disorder. During Ms. W.'s second hospitalization, when she was more cooperative, the team was able to determine that she had a schizoaffective disorder of the bipolar type. Dr. Ajanah opined that, unless a person with such a disorder was undergoing treatment, she would be "hard pressed" to care for herself and could not care for another person. On cross-examination, Dr. Ajanah acknowledged that a person with such a disorder could care for a baby if the person were medicated and receiving therapy.

At the close of the hearing, the court adjudicated Alethea to be a Child in Need of Assistance. It committed her to the Montgomery County Department of Health and Human Services for continued placement with Arrah O.

## DISCUSSION

Section 9–109 of the Courts article addresses the privilege for communications between a patient and his or her psychiatrist or psychologist. It provides, in pertinent part:

(a) *Definitions.*— ...

(3) "Patient" means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist.

. . .

(b) *Privilege generally.*—Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a pa-

tient or his authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder.

. . .

(d) *Exclusion of privilege.*—There is no privilege if:

. . .

(2) A judge finds that the patient, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court and the issue at trial involves his mental or emotional disorder[.]

. . .

Md.Code (1974, 1998 Repl.Vol.), § 9–109 of the Cts. & Jud. Proc. art.

 The purpose of the privilege is "'to aid in the effective treatment of the [patient] by encouraging the patient to disclose information fully and freely without fear of public disclosure.'" *Goldsmith v. State,* 337 Md. 112, 150, 651 A.2d 866, 885 (1995) (dissenting opinion) (citation omitted). The privilege created by § 9–109 applies to records based on communications between patients and their psychiatrists or psychologists relating to diagnosis or treatment, as well as to verbal communications. *See id.* at 123, 651 A.2d 866. Section 9–109(d)(2) makes clear that a judge is empowered to order mental examinations and evaluations in the course of a trial. Provided the individual is informed that "there will be no privilege, makes communications in the course of an examination ordered by the court[,] and the issue at trial involves his mental or emotional disorder," communications between the individual and the psychiatrist or psychologist are not subject to the privilege. § 9–109(d)(2). *See In Re Matthew R.,* 113 Md.App. 701, 714 n. 3, 688 A.2d 955, 960 n. 3 (1997). Under such circumstances, the professional's services are performed for the benefit of the court rather than the individual; any

benefit to the individual is incidental. The purpose of the privilege—to aid in effective treatment—is not served. *See generally Arizona v. Evans,* 104 Ariz. 434, 435, 454 P.2d 976, 977 (1969) (evaluation ordered by court to determine competency to stand trial); *M. v. Pennsylvania State Board of Medicine,* 725 A.2d 1266, 1268–69 (Pa.Commw.Ct.1999) (evaluation ordered upon request of defendant in civil case).

On appeal to this Court, Linda W. reiterates the arguments made by her counsel below. She argues, in essence, that (i) Dr. Ajanah's advisements that her communications would not be confidential were not sufficient to inform her that her communications would be excluded from the privilege under § 9–109(d)(2) and, in any event, because the advisements were given at a time when she was "incompetent" she could not have been expected to understand them; (ii) Dr. Ajanah's testimony referred to communications that occurred after the forensic team had completed the competency evaluations, at points when Ms. W. was receiving treatment at Crownsville [2]; and (iii) even if § 9–109(d)(2) applied to exclude the communications from the privilege for the purposes of the criminal proceedings for which the competency evaluations were ordered, they were not excluded from the privilege for the purpose of the Child in Need of Assistance Proceeding.

### (i)

There is no dispute that Dr. Ajanah advised Ms. W., at the start of each hospitalization, that her communications would not be confidential. By common parlance, of course, a communication is confidential if it is "meant to be kept secret." *Black's Law Dictionary* 294 (7th ed.1999). Ms. W. contends that Dr. Ajanah's advisements were not sufficient to exclude the communications from the privilege under § 9–109(d)(2) because they did not expressly state that there would be no privilege. This argument ignores that the privilege with which we are concerned is the privilege of confidentiality. *See*

---

**2.** Presumably, this argument also refers to the second letter signed by Dr. Ajanah and the psychologist, but not to the first.

*generally Hamilton v. Verdow,* 287 Md. 544, 550, 414 A.2d 914, 919 (1980); *Kovacs v. Kovacs,* 98 Md.App. 289, 309, 633 A.2d 425, 435 (1993), *cert. denied,* 334 Md. 211, 638 A.2d 753 (1994); and *Shaw v. Glickman,* 45 Md.App. 718, 726, 415 A.2d 625, 630, *cert. denied,* 288 Md. 742 (1980) (each referring to the privilege created by § 9–109 as the "privilege of confidentiality").

■■ Section 9–109(b) implicitly provides that "communications relating to diagnosis and treatment of the patient's mental or emotional disorder" are confidential; the section expressly provides that the patient ordinarily has a "privilege to refuse to disclose, and to prevent a witness from disclosing" the communications in "judicial, legislative, or administrative proceedings." As Ms. W. contends, communications may be confidential without being privileged, and " 'privileged' matters enjoy more protection than 'confidential' matters." *Matthew R.,* 113 Md.App. at 710 n. 2, 688 A.2d at 959 n. 2. It is nonsensical to suppose, however, that a matter that is not confidential is nevertheless privileged. If communications between an individual and a psychiatrist or psychologist are not meant to be kept secret, it follows that the individual is not entitled to assert the privilege to prevent disclosure of the communications.

Ms. W. argues, in the alternative, that even if the advisements were sufficient, she could not have been expected to understand them because at the time they were given she was, according to the forensic team, incompetent. Thus, Ms. W. reasons, the communications could not properly be excluded from the privilege under § 9–109(d)(2). As the County observes in its brief, our acceptance of this argument would mean that, every time "the examining psychotherapist finds a defendant not competent, the psychotherapist would be unable to provide any information to the court." Clearly, that is not what the Legislature had in mind when it created the exclusion set forth in § 9–109(d)(2).

In any event, Ms. W. was initially found incompetent to stand trial, not incompetent in general. Dr. Ajanah explained

that when Ms. W. arrived at Crownsville each time, she was not sufficiently cooperative with the forensic team for the team to conclude that she would be able to participate in the trial process. It was for that reason alone that Ms. W. was found, at first, to be incompetent to stand trial. Dr. Ajanah never suggested that Ms. W. could not understand what was said to her. He testified that he "explain[ed] about confidentiality," and he indicated that Ms. W. "express[ed] understanding of confidentiality." The trial court was entitled to accept Dr. Ajanah's testimony that Ms. W. seemed to understand the advisements, as judging the credibility of a witness is clearly a matter "entrusted to the sound discretion of the trier of fact." *In Re Timothy F.*, 343 Md. 371, 379, 681 A.2d 501, 505 (1996).

### (ii)

Linda W. points out that the forensic team made incompetency findings shortly after each of her arrivals at Crownsville; only much later, after Ms. W had been hospitalized and medicated—for five months in the first instance and one month in the second—did the team diagnose her and reach the conclusion that she was competent to stand trial. Ms. W. posits that the communications that led to the initial incompetency findings were the only communications excluded from the privilege under § 9–109(d)(2). She argues that any communications that took place after those findings were made were privileged.

To the contrary, Dr. Ajanah made clear that the team was unable to evaluate Ms. W. when she first arrived at Crownsville because Ms. W. would not cooperate. The team's initial conclusions that Ms. W. was incompetent to stand trial were not based on communications made during examinations but rather on Ms. W.'s refusal to communicate. Dr. Ajanah explained that once Ms. W. was hospitalized—involuntarily the first time and voluntarily the second—she became more cooperative and the team was able to examine her. Dr. Ajanah explained that the evaluation processes were "ongoing" and lasted throughout each of Ms. W.'s hospitalizations. The first

evaluation lasted several months because it took that long for the team to gain Ms. W.'s cooperation.[3]

■ To the extent that Ms. W.'s argument suggests that the communications were not excepted from the privilege under § 9–102(d)(2) because the examinations of Ms. W. were accompanied by treatments, in the form of medication, the argument is without merit. Dr. Ajanah explained that Ms. W. was medicated because she was uncooperative and the evaluations could not otherwise have been performed. Again, the trial court had discretion to credit the doctor's testimony. *See Timothy F.*, 343 Md. at 379, 681 A.2d at 505. While medication for the sole purpose of benefitting the individual might indeed create a patient-psychiatrist/psychologist relationship subject to the privilege, we are persuaded that medication for the primary purpose of facilitating an evaluation would not. In *Evans*, 104 Ariz. 434, 454 P.2d 976, a psychiatrist evaluating a defendant's competency to stand trial pursuant to a court order prescribed tranquilizers to alleviate the defendant's nervousness and anxiety. The Supreme Court of Arizona determined that the trial court properly permitted the psychiatrist to testify about his conclusions regarding the defendant's competency. The court explained: "[W]e believe that [the psychiatrist] functioned primarily as an examiner and not as a psychiatrist." *Id.* at 435, 454 P.2d at 977.[4]

### (iii)

Finally, Ms. W. argues that even if § 9–109(d)(2) applied to exclude the communications in question from the privilege for

---

**3.** Dr. Ajanah testified, in regard to the first evaluation, that Ms. W. entered Crownsville in October and the evaluation was completed in February, but that Ms. W. "had to stay in Crownsville until trial" in March, when she was released. There is no suggestion that Dr. Ajanah testified regarding anything that transpired between the completion of the evaluation and Ms. W.'s release.

**4.** The court further held that the trial court erred by permitting the prosecutor to elicit from the psychiatrist specific inculpatory statements made to him by the defendant during the examination. *Id.* at 435–36, 454 P.2d at 977–78.

the purposes of the criminal proceedings for which the competency examinations were ordered, the communications were not excluded from the privilege for the purpose of the Child in Need of Assistance proceeding. Ms. W. is correct to the extent that she asserts that, in order for the exclusion set forth in § 9–109(d)(2) to apply: a particular individual's mental or emotional disorder must be at issue in a trial; the judge must order an examination of the individual for purposes of that trial; and the judge must find that the individual has been informed that there will be no privilege. It does not follow, however, that communications that are within the exclusion and are not privileged at the contemplated trial somehow become privileged for purposes of any later trial.

 Ms. W. does not dispute that evidence similar to that elicited from Dr. Ajanah and that contained in the two letters was submitted to the District Court in the earlier criminal proceedings, and is therefore now part of the public record. There is no suggestion that the records have been sealed or are not readily accessible to anyone who wishes to review them. Neither this Court nor the Court of Appeals has addressed whether a privilege of confidentiality may exist for one purpose but not for another. It is well-established, however, that when a privilege does exist but is waived for one purpose it will be deemed waived for other purposes absent some reasonable basis for limiting the waiver. *See generally Verdow,* 287 Md. at 552–53, 414 A.2d at 919–20 (waiver of defendant's psychiatrist/patient privilege for one trial constituted waiver for different trial with different plaintiff where issues were similar); *Oregon v. Langley,* 314 Or. 247, 839 P.2d 692 (1992) (where defendant had waived psychotherapist privilege in one murder trial, evidence became matter of public record and privilege was deemed waived for separate murder trial), *adhered to on reconsideration,* 318 Or. 28, 861 P.2d 1012 (1993). As a general rule, moreover, "[p]rivilege statutes are to be narrowly construed." *Reynolds v. State,* 98 Md.App. 348, 368, 633 A.2d 455, 464 (1993). We decline to extend the privilege afforded by § 9–109 to the situation at hand.

(iv)

■ Even assuming, *arguendo*, that the communications in question were privileged and that the trial court committed error, we would find that the error was harmless. Therapist Nikia Miller, who testified at the juvenile court hearing, was accepted by the court as an expert on psychiatric evaluations. Ms. Miller testified that when Ms. W. arrived at the Crisis Center with Althea Ms. W. "appeared psychotic" and "appeared to be responding to internal stimuli." Ms. Miller further stated that Ms. W. reported that she had spent time at Shady Grove and had been diagnosed as a paranoid schizophrenic. Ms. W. indicated that she could not turn to her family for help because her family believed she had an alcohol problem. Although Ms. W. denied that she abused alcohol, Ms. Miller observed on several subsequent occasions that Ms. W. appeared to be under the influence of alcohol. When asked if she believed Ms. W. could care for a baby, Ms. Miller was unwilling to "flat out say that she cannot mother." She opined, however, that the "level of difficulty" for Ms. W. would be "extremely high." She added that "people with schizophrenia, or people that have psychosis, ... can pull it together with medication."

Although Ms. Miller did not specifically diagnose Ms. W.'s condition and her testimony that Ms. W. said she had been diagnosed with paranoid schizophrenia was somewhat at odds with Dr. Ajanah's diagnosis of schizoaffective disorder, Ms. Miller's testimony was substantially similar to Dr. Ajanah's. Both witnesses testified to the effect that Ms. W. suffered from a serious mental disorder combined with an alcohol problem and could not effectively parent unless she was medicated and underwent therapy. In reaching its decision that Althea was a Child in Need of Assistance, moreover, the trial court commented that the diagnosis reached at Crownsville "doesn't hang together all that well." The court indicated it found the testimony of Ms. Miller and the other witnesses, regarding their observations of Ms. W.'s behavior and her handling of Althea, to be "much more important." Thus, we are satisfied that the evidence complained of did not affect the

court's decision, and any error in admitting the evidence would have been harmless. *See In Re Vanessa C.,* 104 Md.App. 452, 459–60, 656 A.2d 795, 798–99 (1995) (in Child in Need of Assistance case, admission of mother's psychiatric records, which were privileged, was harmless error where the court indicated that it relied on other properly admitted evidence regarding the mother's mental health and did not indicate that it relied on the records).

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.