21 A.3d 140

Sahar Begum ALI

v.

STATE of Maryland.

No. 518, Sept. Term, 2010.

Court of Special Appeals of Maryland.

June 1, 2011.

208

210

Robert C. Bonsib (Megan E. Green, MarcusBonsib, LLC, on the brief), Greenbelt, MD, for Appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., KEHOE, ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Baltimore County, Sahar Begum Ali, the appellant, was convicted by a jury of thirteen counts of illegal access to computers, one count of identity theft, one count of unauthorized possession of a computer access code, one count of false application to purchase a regulated firearm, three counts of failure to comply with a peace order, and one count of harassment. All but the false application charge arose out of Ali's conduct towards her therapist, Tina Marie Jenkins, Ph.D. Ali unsuccessfully moved for a new trial.

Ali was sentenced to consecutive three-year terms for two counts of illegal access to computers; 18 months consecutive for identity theft; three years consecutive for unauthorized possession of a computer access code; and three years consecutive for false application to purchase a regulated firearm, for a total of 13 years and six months. The court imposed concurrent sentences of 90 days for each count of failure to comply with a peace order and concurrent sentences of three years for ten of the remaining eleven counts of illegal access to computers.[1] The court suspended all but one year of Ali's sentence; authorized home detention and work release; placed her on probation for three years; and ordered her to have no contact with Jenkins, her practice, or her family.

---

1. The harassment count and the last count of illegal access to computers were "merged" with the other counts "for sentencing purposes."

Finally, Ali was ordered to remain in mental health counseling and treatment with a therapist.

Ali appeals her convictions and the denial of her motion for a new trial, presenting three questions for our review, which we have rephrased:

I. Did the trial court err in denying Ali's motion for judgment of acquittal and motion for anew trial on the charge of false application to purchase a regulated firearm?

II. Did the trial court erroneously allow testimony and admit other evidence that was protected by the psychotherapist-patient privilege?

III. Is Ali entitled to a new trial on all charges?

For the reasons to follow, we answer Question I in the affirmative and therefore shall reverse Ali's false application conviction. We answer Question II in the affirmative with respect to some of the testimony and other evidence that Ali complains about. As to Question III, we shall reverse Ali's conviction for harassment, and remand that charge to the circuit court for further proceedings. Otherwise, we shall affirm the convictions.

## FACTS AND PROCEEDINGS

In March of 2008, Ali became a patient of Jenkins, a licensed clinical psychologist with a solo practice in Howard County. Six months later, in September of 2008, Jenkins terminated her treatment relationship with Ali.[2] At that time, Ali began seeing other mental healthcare providers.

Around December of 2008, Ali called and emailed Jenkins, seeking to resume treatment with her.[3] Ali also had one face-

---

2. Jenkins testified at trial that she initially stopped treating Ali because of "concerns about continuing in treatment." Jenkins did not specify her precise concerns because she thought doing so would have invaded the realm of Ali's privileged communications.

3. Ali contacted Jenkins at her business cell phone number and her business email address.

to-face encounter with Jenkins at a local mall. Jenkins agreed to resume treating Ali. At their first session, on December 30, 2008, Jenkins established boundaries for the treatment relationship. She agreed to see Ali in one 50–minute face-to-face therapy session per week. She also agreed to a maximum of two telephone calls with Ali per week with a maximum duration of 15 minutes per call.

At their second session, after treatment resumed, Jenkins asked Ali to sign a "safety contract." According to Jenkins, a safety contract is a "plan of safety that is particular to each [patient] to make sure they don't act on self-harm or suicidal thoughts." Ali did so in a "safety contract" with Jenkins.

Shortly thereafter, Ali's conduct both inside and outside of therapy began raising concerns for Jenkins. At their third session, Ali brought "an up-close picture of a handgun and bullets." She told Jenkins that she owned the gun for protection because she lived alone and anticipated working late hours in a nursing job for which she had recently applied. Jenkins was of the view that Ali intended to "get a shock response" by showing her the picture.

In subsequent sessions, Jenkins discussed the gun with Ali. Ali said she had sold it back to the dealership where she had purchased it. Jenkins sought to have Ali sign a "gun safety agreement" and provide proof that she no longer owned the gun, but Ali refused at that time.[4]

Ali began sending text messages to Jenkins's business cell phone between in-person therapy sessions; calling her in excess of the agreed number of phone calls; and emailing her frequently.[5] In addition, Ali said something to Jenkins that suggested that Ali and her father were contemplating or had contemplated suing Jenkins for professional malpractice.

---

4. Ali apparently later signed such an agreement.

5. It is not entirely clear from the record whether Ali had been sending text messages and emails to Jenkins throughout the therapeutic relationship. In any event, the frequency of these types of communication apparently increased.

After consulting with colleagues, the Maryland Psychological Association, and Mark Muffoletto, her personal attorney, Jenkins decided she needed to terminate her professional relationship with Ali. In a letter to Ali dated February 20, 2009 ("Initial Termination Letter"), Jenkins wrote:

> As a result of recent threats and innuendos of litigation from you and your father, I must terminate my therapy work with you. Continuing to work with you in this manner would constitute a violation of ethical responsibility in my treatment work with you. Thus, I will work with you to transition to another appropriate treatment provider over the next 30 days from the date of this letter.

> In recent contact that you and I have had about ending our treatment work together I told you I would be available to meet with you this Monday February 23, 2009 at 4:30pm. You stated you did not want to attend, but then later changed your mind. At this time I expect that we will be meeting Monday as planned for a final termination session. Then I will continue to be available to you on an emergency basis for the next 30 days from the date of this letter.

Jenkins went on to reference in the letter the other treatment providers Ali was seeing at the time and to suggest other avenues for treatment that Ali could pursue. In closing, Jenkins reiterated that their final meeting would be on February 23, 2009, and that she would "remain available" to Ali "on an emergency basis until March 22, 2009."

On February 23, 2009, Jenkins and Ali met for their last in-person therapy session ("Termination Session"). Jenkins gave Ali a copy of the Initial Termination Letter (which she previously had mailed to Ali). Ali spent most of the session "tear[ing the letter] into small pieces."

Between February 24 and 27, 2009, Ali sent Jenkins at least 15 text messages. In some, she threatened legal action against Jenkins. In others, she implored Jenkins to respond or have some sort of contact with her. One of the messages included a photo attachment showing Ali's arm with a hypo-

dermic needle injecting something into it. She captioned the photo: "Is this what you want me to do?" [6]

On or about March 6, 2009, Jenkins received an email from Ali that stated: "I will put more cards on this table. This fell into my lap." Attached to the email was a Microsoft Word document entitled "integrity." When Jenkins read the attachment, she recognized it as an email she (Jenkins) had composed and sent to Muffoletto, on February 17, 2009 ("Muffoletto Email"). In the Muffoletto Email, Jenkins had told her lawyer of concerns she had about her ongoing treatment relationship with Ali. The Muffoletto Email that Ali had attached to her March 6, 2009 email to Jenkins had been altered. Using a red font, Ali had inserted her own comments into the text of the Muffoletto Email ("Modified Muffoletto Email").[7]

Jenkins had sent the Muffoletto Email to her lawyer from a Hotmail account she used for her business emails. This was the same account she used to contact her patients and through which her patients contacted her. Around the same time that Jenkins sent the Muffoletto Email she had been experiencing difficulties accessing her Hotmail account. Specifically, when she tried to log into that account she received error messages that either her user ID or her password was incorrect. As a result, she had to change her password several times.

On March 7 and 8, 2009, Ali resumed sending text messages to Jenkins. She sent 26 text messages to Jenkins on those two days. In the text messages, Ali once again implored Jenkins to respond to her. She also reported that she was suffering increasing mental problems, saying, for example, that she was "[l]osing it." Ali repeatedly suggested in the text messages that Jenkins was subjecting herself to potential

---

**6.** We shall discuss the content of the text messages in more detail, *infra*, when we address the issue of privilege.

**7.** We will discuss the content of this email in more detail, *infra*, when we address the issue of privilege.

liability for malpractice by not responding. One message contained a photo attachment of Ali holding a gun to her head.

Also on March 7, 2009, Jenkins wrote Ali a second termination letter ("Final Termination Letter"), which she sent by email and by certified mail. The letter stated:

> On February 20, 2009 I notified you that due to continued threats from you and your father, I was forced to terminate my therapy work with you. I informed you that we would meet once more for a face-to-face termination session on February 23, 2009. I also informed you that after that date until March 22, 2009 I would remain available to you in the case of emergency only. However, since February 23, 2009 you have engaged in threatening and harassing behavior toward me on a continuous basis. As such, you have abused my role of emergency contact person. Based on your threatening and harassing behavior, I can no longer be available to you for emergency contact or otherwise [sic] mental health contact.
>
> Effective this date, this will be my final contact with you. I insist that you cease and desist any and all forms of contact with me immediately. Should you need any clinical intervention or contact, I recommend you utilize the resources I sent to you on February 20, 2009 via certified mail, resources I gave you on February 23, 2009 in our final face-to-face therapy session, as well as those given to you today. . . .
>
> From this date forward should you or other treatment/emergency personnel need to reach me, this may be done only through the use of a mental health provider. Due to your threatening and harassing behavior, I can no longer serve as an emergency or otherwise [sic] mental health contact for you. Your actions have forced me out of the role of mental health provider to you at any and all levels. Please be advised that any attempts by you from this date forward to contact me will be considered threatening and harassing. I will no longer respond to emails, letters, text messages, or other communications from you, nor will I take

phone calls or be listening to any phone messages you may leave. Please know that if you continue this behavior I will be forced to seek judicial and police intervention, including but not limited to a Peace Order and criminal charges for harassment, stalking, and phone misuse.

I regret that you forced me into such measures, but I wish you the best and hope that you take advantage of the mental health resources available to you.

Ali received the Final Termination Letter electronically no later than March 8, 2009; that day she emailed Jenkins acknowledging receipt of it.

On March 12, 2009, in the District Court for Howard County, Jenkins applied for and obtained a temporary peace order against Ali.

On March 16, 2009, Detective Mark Delbusso of the Howard County Police Department met with Jenkins at her home in Sykesville. While they were meeting, Ali called Jenkins's cell phone. Detective Delbusso called Ali back and advised her of the temporary peace order. She had not yet been served with it. Detective Delbusso spoke to Ali for over an hour regarding her complaints about Jenkins's treatment, her ownership of a gun, and other matters.

Ali was served with the temporary peace order on March 17, 2009, at 11:15 a.m. On March 19, 2009, a final peace order hearing was held in the District Court. Ali appeared and consented to the entry of the peace order. A final peace order was issued and was to remain in effect until September 18, 2009. In relevant part, the peace order prohibited Ali from "contact[ing] (in person, by telephone, in writing, or by any other means), attempt[ing] to contact, or harass[ing]" Jenkins.

On April 14, 2009, Detective Delbusso and Maryland State Trooper Edward Winkler submitted an application for a search warrant for Ali's apartment, located in the Windsor area of Baltimore County. The application was filed in the Circuit Court for Carroll County, the county of Jenkins's residence. The search warrant issued and was executed shortly thereafter. Police recovered from Ali's home a hard

copy of the Muffoletto Email and a series of handwritten notes listing Jenkins's home telephone number, her husband's name, the last four digits of her social security number, and names of several other patients she was treating. The police did not recover any guns or other weapons.

On July 14, 2009, Ali was charged in the Circuit Court for Baltimore County with 13 counts of illegal access to computers, one count of identity theft, one count of unauthorized possession of a computer access code, one count of false application to purchase a regulated firearm, three counts of failure to comply with a peace order, one count of stalking, and one count of harassment.

A jury trial commenced on July 13, 2010. The State called four witnesses: Jenkins, Detective Delbusso, Muffoletto, and Gay Hector, the owner of the gun dealership where Ali had purchased a gun.

Jenkins testified consistent with the above stated facts.

Muffoletto testified that Jenkins had sent him an email on February 17, 2009, regarding concerns about her treatment of Ali, and that he had not forwarded that email to Ali or otherwise distributed it to any individual.

Detective Delbusso testified about his investigation of whether Ali had been illegally accessing Jenkins's email accounts. He identified records subpoenaed from the internet service providers through which internet access was made available at Ali's home, her work,[8] and her father's home. The records disclosed the Internet Protocol address ("IP address") associated with each such location.

The detective also identified records subpoenaed from Microsoft Corporation related to three Hotmail accounts: 1) Jenkins's business email account; 2) a second email account set up under Jenkins's name, and 3) a personal email account set up by Jenkins. For the first account, the records showed

---

8. Ali was enrolled in a graduate level nursing program at the University of Maryland, Baltimore and was working at the Armory at Maryland General Hospital as a nursing assistant.

that, on 74 occasions, the account had been accessed via an IP address associated with Ali's home, work, or her family's home. The accesses occurred between January 29, 2009, and March 14, 2009. With regard to the second account, the records showed that the account had been registered on March 14, 2009, from an IP address associated with Ali. It had been accessed only by IP addresses associated with Ali over a three-day period between March 14 and March 16, 2009. For the third account, the records showed no access by Ali.

Detective Delbusso identified records subpoenaed from America Online regarding an account that Ali setup under Jenkins's name in March of 2009. Jenkins had testified that she did not have an email account with America Online.

Detective Delbusso also identified phone records subpoenaed from Ali's and Jenkins's cell phone service providers. The records showed that Ali had made three phone calls to Jenkins on June 24 and June 25, 2009. The calls were made when the final peace order was in effect.

At the close of its case-in-chief, the State voluntarily dismissed the stalking charge. Ali's counsel moved for judgment of acquittal on all counts, although his argument focused primarily on the charge of false application to purchase a regulated firearm. The motion was denied.

Ali did not testify or call any witnesses on her own behalf. Defense counsel renewed his motion for judgment of acquittal at the close of all the evidence.

As stated above, the jury convicted Ali on all counts. She subsequently moved for a new trial, arguing that the State had failed to prove the elements of the charge of false application to purchase a regulated firearm and that the entire trial had been tainted by the introduction of privileged information regarding her treatment. The motion was denied. Ali noted a timely appeal.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### Sufficiency of Evidence to Support Conviction of False Statement on a Firearm Application

■ Pursuant to Md.Code (2003, 2010 Supp.), section 5–139(a) of the Public Safety Article ("PS"), Ali was charged with "knowingly giv[ing] false information or mak[ing] a material misstatement in a firearm application." The charge was premised on her answers to two related questions on the federal and state firearm applications.

In December 30, 2008, Ali went to the "Just Guns, Inc." gun store in Harford County and applied to purchase a firearm. She completed two firearm applications. The federal form, entitled "Firearms Transaction Record Part I—Over–the–Counter" asked at Question 11(f) whether the applicant ever had been "adjudicated mentally defective (*which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs* ) **OR** have you ever been committed to a mental institution?" (Emphasis in original.) The State form, entitled "Maryland State Police Application and Affidavit to Purchase a Regulated Firearm," asked at Question 8 whether the applicant had "ever been adjudicated mentally defective or [ ] been committed to a mental institution?" Ali answered "No" to both questions. On January 8, 2009, after the dealership completed the necessary background checks, Ali purchased a handgun.

At trial, the State introduced evidence that, on May 27, 2008, Ali was taken to Northwest Hospital as a result of a petition for emergency evaluation. She was involuntarily admitted to the psychiatric unit and placed under observation. The next day, two doctors at the hospital signed physician certifications stating that, after examining Ali, it was their opinion that she needed inpatient care for treatment for major depression and post-traumatic stress disorder. That same day, Ali was transferred to Sheppard Pratt Hospital for

observation. While there, Ali signed a Notice of Hearing form acknowledging that she had been advised that she would have a hearing on June 3, 2008, to determine if she should be involuntarily committed to a mental health facility. On May 30, 2008, before any commitment hearing was held, Ali was discharged. Her discharge papers stated that she was being "[r]elease[d] from observation." Ali was discharged to her home address.

At the close of the State's case-in-chief, Ali's counsel moved for a judgment of acquittal on the false information charge on the basis that Ali never had been "committed" to a mental health institution or "adjudicated" mentally defective. He argued that involuntary admission to a hospital or mental health facility for observation is not the equivalent of a commitment and that no "adjudication" had occurred in Ali's case. The prosecutor responded by arguing that an involuntary admission on an emergency petition qualified as a "commitment" and thus Ali had made a misrepresentation on the application forms she completed when she purchased her firearm.

Finding no Maryland cases on point, the court looked to out-of-state cases and concluded that the trend was to hold that an involuntary hospitalization for mental health observation "was a commitment within the meaning of the federal gun control statute." Therefore, the trial court denied the motion for judgment of acquittal. As noted, the jury convicted Ali on this count. Ali subsequently moved for a new trial, again arguing that she never had been "committed" to a mental health institution. Her motion was denied.

A little less than six months after the verdict in this case, on July 2, 2010, this Court decided *Furda v. State*, 193 Md.App. 371, 997 A.2d 856 (2010). We were asked "whether an involuntary hospital admission under Maryland law, for the purpose of an emergency mental health evaluation, constitutes a 'commitment' under federal law, so as to bar the admittee's right to possess a regulated firearm in Maryland." *Id.* at 376, 997 A.2d 856. After an evaluation of federal and state law, we were persuaded by

the logic of jurisdictions that have construed "committed" as applying to situations in which, at the very least, the patient has been afforded an evidentiary hearing, held either by a court or a hearing officer; the patient or the defendant has a right to appear and has the right to counsel; and findings are made by the factfinder, based on competent medical evidence. In the absence of such minimal safeguards, the term does not extend to a brief hospitalization for purposes of an emergency mental health evaluation.[9]

*Id.* at 410–11, 997 A.2d 856.

As the State concedes, the *Furda* decision controls this issue in the instant case. The evidence at trial was that, over a three-day period, Ali was held involuntarily "for purposes of a mental health evaluation" and that during that time she was not afforded an evidentiary hearing, and no factual findings were made as to her condition. Therefore, for the reasons fully explained in *Furda,* Ali was not "committed" to a mental institution. It follows that her conviction for false application to purchase a regulated firearm must be reversed because the evidence adduced at trial was legally insufficient to sustain it.

## II.

### Admission of Evidence in Violation of the Patient–Psychotherapist Privilege

Ali contends the trial court erred on numerous occasions by admitting into evidence privileged communications she had

---

**9.** Unlike in the instant case, in *Furda,* the defendant sought the return of firearms registered to him which had been confiscated by police when they served him with a temporary protective order and order for emergency mental evaluation. He was not being charged with making a false application to purchase a firearm.

In a companion case, *Furda v. State,* 194 Md.App. 1, 1 A.3d 528, *cert. granted,* 417 Md. 125, 9 A.3d 1 (2010), we upheld the defendant's conviction for perjury after he subsequently applied to purchase a firearm and answered, "No," to the same questions answered in the negative by Ali. We concluded that despite the circuit court's erroneous ruling that Furda had been "committed" to a mental institution, he was bound by that ruling at the time he completed the application and, thus, could not honestly answer those questions in the negative.

with Jenkins. On the basis of privilege, she challenges the admission of Jenkins's testimony concerning the "boundaries" placed on their therapeutic relationship; about a photograph Ali brought to a therapy session and Ali's ownership of a gun; and about "safety contracts." Ali also challenges on the ground of privilege admission of text messages she (Ali) sent to Jenkins between February 24 and March 8, 2009, and of the Muffoletto Email and the Modified Muffoletto Email.[10]

The State counters that many of Ali's claims are unpreserved and that those claims that are preserved lack merit. Specifically, the State argues, for the first time, that Ali waived the patient-psychotherapist privilege by introducing her mental condition as an element of her defense at trial. It also argues that the trial court correctly determined that the testimony and documents at issue were not privileged because they did not concern Ali's treatment or diagnosis.

"While not specifically privileged under the common law, communications between a patient and his or her psychotherapist or psychologist are now statutorily privileged." *Bryant v. State*, 393 Md. 196, 204, 900 A.2d 227 (2006). The privilege is codified at Md.Code (2006 Repl.Vol., 2010 Supp.), section 9–109 of the Courts and Judicial Proceedings Article ("CJP"), entitled "Communications between patient and psychiatrist or psychologist."

CJP section 9–109(b) generally establishes the privilege:

Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:

(1) Communications relating to diagnosis or treatment of the patient; or

---

10. The State includes in its brief an argument that the Initial and Final Termination letters properly were admitted into evidence. We do not read Ali's brief or reply brief to argue that these letters were inadmissible. In any event, the letters were moved into evidence without objection.

(2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment.

Subsection (d) enumerates circumstances in which the privilege does not apply:

There is no privilege if:

(1) A disclosure is necessary for the purposes of placing the patient in a facility for mental illness;

(2) A judge finds that the patient, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court and the issue at trial involves his mental or emotional disorder;

*(3) In a civil or criminal proceeding:*

*(i) The patient introduces his mental condition as an element of his claim or defense;* or

(ii) After the patient's death, his mental condition is introduced by any party claiming or defending through or as a beneficiary of the patient;

(4) The patient, an authorized representative of the patient, or the personal representative of the patient makes a claim against the psychiatrist or licensed psychologist for malpractice;

(5) Related to civil or criminal proceedings under defective delinquency proceedings; or

(6) The patient expressly consents to waive the privilege, or in the case of death or disability, his personal or authorized representative waives the privilege for purpose of making claim or bringing suit on a policy of insurance on life, health, or physical condition.

(Emphasis added.)

█ "The privilege [in CJP section 9–109] belongs to the patient to assert, not to the psychiatrist [or psychologist]." *Eiler v. State*, 63 Md.App. 439, 445 n. 6, 492 A.2d 1320 (1985). In *Laznovsky v. Laznovsky*, 357 Md. 586, 613 n. 13, 745 A.2d 1054 (2000), the Court of Appeals quoted with approval a decision of the United States Court of Appeals for the District of Columbia discussing the unique nature of the relationship between a patient and a mental healthcare provider:

"In regard to mental patients, the policy behind [a privilege] statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. 'The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.' "

(Quoting *Taylor v. United States,* 222 F.2d 398, 95 U.S.App. D.C. 373, 376 (D.C.Cir.1955) (in turn quoting Guttmacher and Weihofen, *Psychiatry and The Law* (1952), p. 272)). This Court has further explained:

> The purpose of the privilege is " 'to aid in the effective treatment of the [patient] by encouraging the patient to disclose information fully and freely without fear of public disclosure.' " *Goldsmith v. State,* 337 Md. 112, 150, 651 A.2d 866, 885 (1995) (dissenting opinion) (citation omitted). The privilege created by § 9–109 applies to records based on communications between patients and their psychiatrists or psychologists relating to diagnosis or treatment, as well as to verbal communications. *See id.* at 123, 651 A.2d 866.

*In re Alethea W.,* 130 Md.App. 635, 641, 747 A.2d 736 (2000).

*A. Waiver of Privilege*

■ At the outset of Jenkins's testimony, she was asked to "describe [her] relationship with [Ali.]" Jenkins expressed reservations about answering the question, citing concerns about the "HIPPA [sic] privilege." [11] The court asked the parties to approach. Defense counsel stated, "No privileges

---

11. Throughout the trial, counsel repeatedly characterized the privilege at issue as the "HIPPA [sic] privilege," referring to the Health Insur-

are being waived." At the conclusion of the bench conference, the court allowed the prosecutor to question Jenkins briefly on the issue of privilege and Jenkins agreed that Ali had not waived any privilege. The prosecutor said she would frame her questions generally and advised Jenkins to refuse to answer if she believed doing so would infringe upon Ali's privilege.

At no time before or during trial did the prosecutor argue that Ali had waived her privilege by "introduc[ing her] mental condition as an element of h[er] claim or defense." *See* CJP section 9–109(d)(3). The State advances this argument for the first time on appeal, stating that "defense counsel used opening statement to presage the defense that Ali did not act with the requisite criminal intent because of her mental condition." Specifically, the State asserts that "Ali affirmatively introduced her mental condition—her alleged desperation—to explain her admitted conduct as not willful and therefore not criminal."

Ali responds that this argument may not be raised for the first time on appeal. And, moreover, it was the State that introduced her mental state as an element of the prosecution. In that situation, she was entitled to rebut the State's assertions without waiving her privilege by virtue of CJP section 9–109(d)(3).

In *In re Matthew R.*, 113 Md.App. 701, 688 A.2d 955 (1997), this Court expressly declined to consider a waiver argument under CJP section 9–109(d)(3) when the privilege had been "plainly asserted" below, the other party had not argued

---

ance Portability and Accountability Act of 1996 ("HIPAA"), a federal law mandating confidentiality of medical records. Pub. Law 104–191, 110 Stat.1936(1996). Maryland also has a medical record confidentiality statute, codified at Md.Code (2009 Repl.Vol., 2010 Supp.), section 4–301 *et seq.* of the Health General Article ("HG"). HG section 4–307 governs the disclosure of mental health records.

Despite the references to HIPAA, the court clearly understood the issue before it to be whether communications made by Ali to Jenkins were privileged under CJP section 9–109. The parties are in agreement that this is the issue that was decided below and is before this Court on appeal.

waiver, and the court had made no findings on the issue of waiver. 113 Md.App. at 706, 688 A.2d 955. In that case, the party asserting the privilege was a mother in a CINA proceeding. The court ordered, *sua sponte*, that the mother disclose certain mental health records. She refused and appealed the court's order to that effect. The Montgomery County Department of Social Services ("Department") argued for the first time on appeal that the mother had waived her privilege by introducing into evidence a letter from a mental health practitioner who recently had evaluated her in an unrelated custody matter in California. The letter stated that the mother suffered from bipolar disorder, but was compliant with her medication and was not currently symptomatic. According to the Department, by moving the letter into evidence to show that she was "mentally fit for custody," the mother had introduced her mental condition as an element of her claim; therefore, the juvenile court properly ordered her to disclose all of her psychiatric records. *Id.* at 714, 688 A.2d 955.

We held that the Department had forfeited its waiver argument by failing to raise it below. We emphasized that the burden was on the party asserting waiver to prove that the privilege had been waived and that, once waiver has been asserted, it is incumbent upon the trial court to conduct an inquiry and make findings on the issue. We further concluded that, even if the waiver argument had not been forfeited, it nonetheless lacked merit because the Department, not the mother, had introduced the mother's mental condition as an element of its claim that she was unfit to maintain custody of her son. In that circumstance, the mother was permitted to rebut the claim without waiving her privilege by operation of CJP section 9–109(d)(3).

Similarly, in *McCormack v. Board of Education*, 158 Md. App. 292, 857 A.2d 159 (2004), we declined to consider a waiver argument under CJP section 9–109(d)(3) that was raised for the first time on appeal. In that case, the parents of a minor child were barred from introducing evidence of his psychological treatment records during a negligence case in which they

sought damages for injuries sustained by the child in a school bus accident and reimbursement of medical expenses paid by them. During trial in the matter, the court ruled that there was a conflict of interest between the parents and the child and for that reason the parents either would need to consent to a postponement to allow a guardian to be appointed for the child to determine whether the privilege should be waived or be barred from introducing the records. The parents refused to consent to a postponement and the records were excluded. Although we ultimately concluded that the court's ruling was in error, we declined to consider the parents' argument that their child had waived his privilege by introducing his mental condition as an element of his claim, as the argument had not been raised below.

In the instant case, the State acknowledges that it did not raise below the waiver argument it presses on appeal. It maintains, nonetheless, that Ali would not be prejudiced if this Court were to affirm on this ground because Ali first challenged the admission of the allegedly privileged communications mid-trial, after she had introduced her mental condition as an element of her defense through remarks by her lawyer in opening statement. Thus, if the State had argued waiver below upon first learning that Ali intended to object to evidence on the basis of privilege, that argument would have been made *after* Ali already had waived the privilege.

During the prosecutor's opening statement, she urged the jurors not to judge Ali based upon how she appeared sitting in the courtroom because that was not the "real Sahar Ali." The prosecutor showed the jurors the photograph of Ali holding a gun to her head that Ali had texted to Jenkins, saying the photograph showed "the real Sahar Ali."

Defense counsel's opening statement focused largely on the charge of false application to purchase a firearm. He described the prosecution case as an "upside down" "pyramid," where the base was a "huge lie." The "lie," according to defense counsel, was that Ali had made a misrepresentation on her firearm application. Defense counsel then asked the jurors to remember that Ali never

point[ed] a gun at another person, not at Dr. Jenkins, not at anybody. At most this is goofiness. She is pointing the gun at her own head [referring to the photograph]. The reason she's doing that is she's crying out for help.

What is the help that she's crying out for? She doesn't want Dr. Jenkins to terminate the doctor-patient relationship. A doctor shouldn't do that. A doctor shouldn't abruptly terminate a relationship. A doctor should make sure that, if anything, the patient is transferred to another doctor first and then terminate the relationship. There should be an easy segue. It shouldn't be abrupt.

And there was a letter of termination and Sahar Ali was desperate. She sent the picture of the gun to her head. Is this how you want to help me? By terminating the relationship? Please don't be inflamed. The picture is not a threat to others. The picture was a cry for help.

We disagree with the State that these remarks by defense counsel in opening statement introduced Ali's mental condition as an element of her defense. The State's overarching theory of the case, communicated in opening statement, was that Ali was a disturbed individual who manipulated, harassed, and invaded the privacy of her therapist. Defense counsel, in response to these assertions and the prosecutor's display of the photograph of Ali with a gun to her head, emphasized that at most Ali was making a desperate attempt to resume contact with Jenkins after Jenkins had terminated the therapeutic relationship. In essence, defense counsel was asking the jury to understand why Ali would have been motivated to send what was, by all accounts, a disturbing photograph. She was not acting maliciously, according to defense counsel; rather, she was seeking help from her therapist. This was not the equivalent of arguing that Ali could not form the requisite intent to commit the crimes charged because of a mental defect or otherwise introducing her mental condition as an element of her defense.[12]

---

12. Similarly, in defense counsel's closing argument, he argued that the State had failed to prove that Ali had acted "willfully" as to each charge:

In any event, because the State failed to raise the waiver of privilege argument below, Ali was deprived of the opportunity to rebut the State's assertion of waiver and the court was deprived of an opportunity to make findings on this issue. Thus, even if we were persuaded that Ali had introduced her mental state as an element of her defense, we nonetheless would decline to consider this argument on appeal.

### B. Boundaries of Treatment Testimony

■ Ali asserts that Jenkins was permitted, improperly, to testify "over objection[ ] to the specifics of boundaries that Dr. Jenkins set up with Ali." The State responds that this argument is not preserved for review. We agree.

Early in Jenkins's direct examination, she was asked, "What were the boundaries that were set up between yourself and [Ali]?" Defense counsel objected, stating that he believed Jenkins's answer would "violate the HIPPA [sic] privilege." [13] A bench conference followed:

---

And what is willful? On the next page the judge describes that willfully characterizes an act which is done knowingly, with deliberate intention, and for which there is no reasonable excuse.

No reasonable excuse. None. For crying out loud, the whole reason for the access was Sahar Ali was crying out for help. She didn't say to the doctor I'm going to steal your money, I'm going to choke you or hurt you. She's saying I need help, do you want me to do this to me. She didn't say do you want me to do this to you. She said do you want me to do this to me. That's a cry for help.

Now, by any reckoning, that's goofy. But we can't say she did this without any reasonable excuse. There is an excuse. Sahar Ali is a patient of Dr. Jenkins. And Dr. Jenkins is trying to terminate the relationship. If it were me, if [I] want to terminate the relationship, sure, find another doctor. It's not me. It's not you. This is Sahar Ali. She's committed to Dr. Jenkins. She wants to finish with Dr. Jenkins, whatever it was, in the therapy sessions that she started. That is her excuse. It seems to me that is an excuse that somebody would have. It negates the willfulness element of the charge.

Again, we view defense counsel's argument as an attempt to rebut the State's argument that Ali acted maliciously and with the intent to annoy or harass Jenkins. He did not argue that Ali was incapable of acting willfully; rather, he argued that she was, in fact, acting based on her honest desire to continue in the therapeutic relationship with Jenkins.

**13.** *See* n. 10, *supra.*

THE COURT: How is that not—

[PROSECUTOR]: It's asking—I can ask specifically the question what the boundaries are. I can ask specifically if we are going to meet once a week we are going to have boundaries and what they are, not what they are meeting about.

[DEFENSE COUNSEL]: I think it's setting a pattern as opposed to any substantive question.

THE COURT: I'll allow the question in that area.

The prosecutor then rephrased her question, without objection, to inquire as to whether Jenkins set up boundaries on "how often [Jenkins] and [Ali] would meet for sessions?" She also asked Jenkins, again without objection, what rules were established about telephone contact outside of therapeutic sessions. Jenkins responded, as discussed above, that she and Ali were to meet once per week and that Ali was permitted two 15–minute telephone calls per week outside of these sessions.

The State maintains, and we agree, that defense counsel's comment at the bench conference that the prosecutor's proposed question was "setting a pattern as opposed to any substantive question" was an implicit withdrawal of his prior objection. Defense counsel's failure to object to the rephrased questions after the bench conference confirms that that is what happened. Although defense counsel objected to the prosecutor's inquiring generally about boundaries on Ali's and Jenkins's therapeutic relationship, he did not object to the targeted inquiry into the timing of sessions and telephone calls each week. The question whether this evidence should not have been excluded pursuant to CJP section 9–109 is not preserved for review.

## C. Gun Testimony

■ Ali next suggests that it was error for the trial court to allow Jenkins to testify about conversations she and Ali had concerning Ali's ownership of a gun. Jenkins testified that Ali brought a picture of a handgun and bullets to their third face-

to-face session after therapy resumed in December of 2008. She further testified about what Ali told her during that session about why she owned the gun and when she had obtained it. Finally, Jenkins testified about follow-up discussions she had with Ali concerning the gun. All of this testimony came in without objection. Accordingly, this argument is not preserved for review.

## D. Safety Contract

 Ali argues that Jenkins should not have been permitted to testify about a "safety contract" that they entered into as part of the therapeutic relationship. Initially, the prosecutor asked Jenkins about the nature of the safety contract she entered into with Ali. Defense counsel objected and the trial court sustained the objection, directing the prosecutor to ask only general questions about safety contracts. The prosecutor then asked Jenkins, "Can you tell the Court generally what a safety contract is?" Jenkins responded:

> Safety contract is working with any kind of outpatient therapy that if they become a danger to themselves or others, any form of self-harm or suicidal thoughts, that we make a plan of safety that is particular to each client to make sure they don't act on self-harm or suicidal thoughts.

Ali's objection to a particularized inquiry into the safety contract between Ali and Jenkins was sustained. She did not object to the prosecutor's rephrased, generalized inquiry and she does not explain how Jenkins's testimony about the general nature of a safety contract would be protected under CJP section 9–109. Accordingly, this argument was not preserved for review and plainly lacks merit.

## E. Text Messages

Ali next contends the trial court erred in admitting into evidence a series of text messages she sent to Jenkins between February 24, 2009, and March 8, 2009. These text messages all were sent after Ali had received the Initial

Termination Letter but before she had received the Final Termination Letter.[14]

In the course of Jenkins's direct examination, the prosecutor made known that she intended to introduce into evidence text messages sent by Ali to Jenkins both before and after the date of the Initial Termination Letter (February 20, 2009). After hearing some argument at the bench, the trial court excused the jury and conducted a suppression hearing.

Jenkins testified that she considered the text messages to be a "manipulation" and an attempt to "force a response back from [her] outside of the boundaries." She explained that even those messages sent prior to the Initial Termination Letter fell outside the permissible communications boundaries she and Ali had agreed upon. Jenkins was unsure whether she might have had any contact with Ali, aside from their Termination Session, between the dates of the Initial Termination Letter and the Final Termination Letter. She acknowledged that it was possible that she called or sent a text message to Ali in that time frame in response to one or more of the text messages.[15] She further acknowledged that, although Ali's communications were outside the boundaries of permitted communications, Ali nevertheless could have thought she was making a request for treatment.

In response to questions from the court, Jenkins described "the parameters ... for emergency contact" that she established during the Termination Session on February 23, 2009: "[Ali] could have contact if there would be an extreme case of self-harm, suicide, attempted suicide. She also had other options, to call 911, go to the emergency room, contact her other treatment providers."

The trial court ruled as follows:

---

**14.** Jenkins testified that Ali acknowledged receipt of the Final Termination Letter, via email, at 6:01 a.m. on March 8, 2009. The last text message was sent on March 8, 2009 at 3:37 a.m.

**15.** Jenkins's statement in the Final Termination Letter that she would "no longer respond" to any communications suggested that she previously had responded in some form to certain of Ali's communications.

On this issue and the evidence before me, let me just be clear on where I am. Just because a communication is somewhat outside the boundaries that are established by a [psychologist] at the outset doesn't mean that the context of the communication is unprivileged. I think the doctor was saying the boundaries you work on in a relationship, you might view it with greater latitude, that the communications by the patient are believed to be privileged even though the doctor believes they are outside the purviews of appropriate communications that were set.

The privilege itself is broadly based. It belongs to the patient and it applies to communications made or relating to diagnosis or treatment of the patient and it belongs to the patient. I think the question exists when that confidentiality of the relationship exists in the nature of communications that become threatening or criminal in nature.

Quite frankly, I haven't even found any law in Maryland that talks about that when privilege is waived. A question also exists when communications are made by a medium that is not itself necessarily privileged, when you text, whether you do it in some way that it could be accessed by others, whether you have in effect waived your privileges. Again, I found no guidance on that issue.

What is clear in the context of this case is on [February] 20th the doctor told the patient that she needed to terminate their relationship and she left a grace period of 30 days where she could continue to be contacted if necessary in an emergency.

I have allowed in—I have kept out the communications that pre-date the 20th because frankly, while there is an argument there, it's not clear from the context that the patient didn't believe them to be somehow within the physician-patient relationship.

From the communications that started after the 20th, and in number on the Bates numbers on these that start with Number 18, which is a communication on [February] 23rd, there is a series of communications on the 23rd and early on the 24th where Miss Ali is basically saying, I'm having an

emergency. There is little other than that fact that there is a continuation of efforts to communicate beyond the boundaries of what is established.

There is little in terms of content [t]hat is particularly relevant. It's just a number of communications and continuing forms of communication outside the boundaries.

But there is a point in time on [February] 24th, and from my review of this it starts with Bates Number 33 and continues from that point forward where the tone of communications are not even arguably related to treatment. The tone clearly is—this one starting with Number 41 of 68 says, ["]this is professional negligence again if you are ignoring me. Getting frustrated and worse on top you are telling me I won't make it.["]

The nature of these, the timing of them have them coming on the heels of being told that the relationship is terminated and to only communicate in the event of an emergency and to seek help from other physicians. And given the doctor's testimony that they had a final meeting in her office, she said we're done, you need to move on, in my judgment from Bates Number 33 through the balance of State's Exhibit 5 there is no privilege that attaches to any of those text messages. The nature of the content isn't treatment related. The timing does not show it to be part of a professional relationship. So those are admissible.

A total of 41 text messages were admitted. As already mentioned, two had photographs attached to them. The content of most of the text messages can be placed into three general categories: 1) suggestions that Jenkins was committing professional negligence by terminating the therapeutic relationship and cutting off contact with Ali; 2) requests that Jenkins respond to her; and 3) statements that Ali's mental condition was deteriorating as a result of the cessation of contact with Jenkins and implicit or explicit threats of self-harm. There also are several text messages that defy categorization.

The court concluded that none of the text messages were privileged, opining that "[t]he nature of the content isn't treatment related [and t]he timing does not show it to be part of a professional relationship." We are constrained to disagree.

The timing of the messages was an important factor in the court's analysis. The trial court excluded text messages preceding the sending of the Initial Termination Letter. Thus, regardless of the nature of the content, the court viewed text messages sent to Jenkins during the ongoing psychotherapist-patient relationship to be privileged communications. The court also excluded numerous text messages sent on February 23 and 24, 2009, after Jenkins sent the Initial Termination Letter. In these text messages, Ali stated that she was having an "emergency"; as the Initial Termination Letter provided that there would be a 30–day grace period, until March 22, 2009, for emergencies, the court decided that these text messages fell within the exception to the termination of contact. Beyond that point in time, the court admitted all of the text messages sent by Ali to Jenkins.

As the court recognized, however, a psychotherapist-patient relationship may have shifting boundaries. A troubled patient may not have the same understanding of a termination letter as a therapist, especially when, as here, the therapist allows the patient to maintain contact "on an emergency basis" for an additional period of time. Jenkins herself testified that Ali was permitted to contact her if she was contemplating self-harm. From Ali's perspective, it is quite possible that she considered herself to be in a state of emergency when she was faced with the prospect of losing contact with Jenkins. We do not view the timing of the emails in relation to the Initial Termination Letter as being the decisive factor in determining whether the text messages were privileged communications.

 We begin by addressing those messages and portions of messages that we conclude fall outside the bounds of the

privilege. We reproduce these messages below: [16]

| Date | Time | Bates # | Privileged Content |
|---|---|---|---|
| February 24, 2009 | 11:24 p.m. | 33 | This is prof. negligence again if u r ignoring me . . . . . |
| February 24, 2009 | 11:34 p.m. | 34 | I think my dad was right. He said u were looking or wanted a [law] suit. Is that true. Im not threatening.Im nor [sic] for that. But is that true cuz u act like it except |
| February 25, 2009 | 12:09 a.m. | 36 | Thanks a lot. I deserve a scarf for this and candy |
| February 25, 2009 | 12:17 a.m. | 37 | And other fun automatic toys |
| March 7, 2009 | 2:11 a.m. | 50 | . . . Do the right thing u know what it is. Ball is in your court. Wish you would respond appropriately. Not threat |
| March 7, 2009 | 2:23 a.m. | 51 | I really hope u answer in whatever form and tie up these loose ends. Don't put yourself in jeopardy. Not threatening or being mean |
| March 7, 2009 | 3:44 a.m. | 54 | Ur probably asleep but are u ever going to answer esp. With what i sent earlier today. I know u read them |
| March 8, 2009 | 3:37 a.m. | 79 | R u freakin serious? ? is this about the integ- |

---

**16.** We have reproduced Ali's text messages largely without modification except when necessary to aid in comprehension. Many of the text messages cut off mid-word or mid-sentence. Except where noted, ellipses reflect our deletions.

rity document? If any-
thing i should be
pissed about it. But
when it came to me i
wasn't mad cuz i al-
ready knew how

The above-quoted full and partial text messages clearly do not relate to Ali's treatment or diagnosis and therefore are not privileged communications. None of the messages comment on Ali's mental state. Ali merely expresses her view that Jenkins is committing professional negligence by terminating the therapeutic relationship and/or refusing to respond to Ali's messages; implores her to respond; and otherwise communicates with her outside of the therapeutic relationship.

█ The communications made by Ali in the balance of the text messages suggest, however, that she was in a crisis state because of the lack of contact with Jenkins and either express-ly state or imply that she might harm herself if Jenkins does not respond. We conclude that this content was privileged except, as discussed below, when the same content already was before the jury without objection:

| Date | Time | Bates # | Privileged Content |
|------|------|---------|---------------------|
| February 24, 2009 | 11:24 p.m. | 33 | . . . Getting frustrated and worse on top of u telling me i wont make it. |
| February 25, 2009 | 12:01 a.m. | 35 | Help please r u doing this on purpose |
| February 25, 2009 | 12:27 a.m. | 38 | I knew [you'd] be en-joying this an d its kill-ing me. Do u need calming pictures or videos? |
| February 25, 2009 | 12:34 a.m | 39 | Is this another setup cuz im not dead yet? How far do u want this to go? |
| February 25, 2009 | 12:38 a.m. | 40 | Is this seriously what u want? Don't test me on this |

| | | | |
|---|---|---|---|
| February 25, 2009 | 12:42 a.m. | 41 | Y aren't u answering. U make it clear u want this as far as it can go. I know ur getting these. What do i have to do? ... All over again ... |
| February 25, 2009 | 10:33 p.m. | 42 | Help her she doesn't deserve this |
| February 25, 2009 | 11:25 p.m. | 43–45 | [Photo Attachment depicting hypodermic needle in Ali's arm.] Is this what you want me to do? |
| February 26, 2009 | 12:17 a.m. | 46 | Why won't you call? ? I don't get this. You said you will respond. Why won't you keep your word. I always kept mine. I never lied |
| February 26, 2009 | 1:33 a.m. | 47 | This isn't a game to me or ever was. Im not trying to be manipulative. This isn't right. Its not right when its not all my fault. Did u tell ur lawyer all of th |
| February 26, 2009 | 11:48 a.m. | 48 | OMG!!! ru still ignoring me. WTF? ? How bad do u want me dead? U've gotten pretty close |
| February 27, 2009 | 12:24 a.m. | 49 | Help please still coding very badly |
| March 7, 2009 | 2:11 a.m. | 50 | Don't keep me like this. Don't think it will be good..... |
| March 7, 2009 | 2:35 a.m. | 52 | Geez, im escalating pretty fast cuz of you. Not threatening. Trying to contain it. can't |

do this forever. Losing it. Not threatening but urgent.

| | | | |
|---|---|---|---|
| March 7, 2009 | 2:45 a.m. | 53 | Don't leave me hanging like this. It's unprofessional, unjust, and cruel to a TRAUMA victim/pt and perhaps a liability. Not threatening or trying to be mean or |
| March 7, 2009 | 4:00 a.m. | 55 | I wish we could put a stop to this. I know u don't lose any sleep over this like i do and u are at peace. your life goes on. Ur fortunate. im doomed. Not threat |
| March 7, 2009 | 4:09 a.m. | 56 | Losing hope rapidly. Cant get it anymore. pointless to tell you cuz u don't care. Did u really have to do this to me. Didn't anyone tell u about post termination c |
| March 7, 2009 | 10:20 a.m. | 57 | I know u don't give a f* * * at all. But i'm only going to get worse and worse when you ignore me and play this game. Not threatening. It really creeps me out. it |
| March 7, 2009 | 10:21 a.m. | 58 | Ps don't forget my records |
| March 7, 2009 | 10:28 a.m. | 59 | I have nothing to lose. You are really setting yourself up but at least you'll have life. Not threatening |

| | | | |
|---|---|---|---|
| March 7, 2009 | 10:44 a.m. | 60 | You really are good at "getting rid of me for good" you've wanted this from the beginning. don't lie again this one I can shock you again. No that's not a thre |
| March 7, 2009 | 10:45 a.m. | 61 | [Duplicate of above.] |
| March 7, 2009 | 10:55 a.m. | 62 | Geez what do i have to do to show u im in really bad state. This is no different than any other invalidating environment. YOU'RE NOT ANY BETTER THAN MY DAD. At |
| March 7, 2009 | 11:02 a.m. | 63 | How do you want this to end? do you forget that you are licensed and im the patient. can't believe you are willing to risk that when i took tons of crap to prot |
| March 7, 2009 | 11:05 a.m. | 64 | I feel really sick |
| March 7, 2009 | 1:20 p.m. | 65 | R u there? Im barely getting thru the next hr. Don't know how much longer i can take this. |
| March 7, 2009 | 1:30 p.m. | 66 | Why are you doing this? Do you want to be held responsible? |
| March 7, 2009 | 2:07 p.m. | 67 | After all this you still can't tell me why? Do you need to see the effects of one irrationale [sic] decision? |
| March 7, 2009 | 2:27 p.m. | 68 | All i am is asking why did you d/c me? So at least the intensity of |

| | | | |
|---|---|---|---|
| | | | this episode can go down? But u don't care or else u would have answered numerous texts an |
| March 7, 2009 | 3:16 p.m. | 69–73 | [Photo attachment depicting Ali with a gun to her head and text.] [17] |
| March 7, 2009 | 3:50 p.m. | 74 | Geez are you willing to risk this? THIS IS A HUGE LIABILITY. Especially since you've been ignoring everything and know. you are set on having me out of this wor |
| March 7, 2009 | 7:44 p.m. | 75 | Am i going to die? Sad face |
| March 7, 2009 | 7:57 p.m. | 76 | I hope so. This isn't fun. gonna try to get home. Have a 10 pg note already. Chronicizes [sic] whole life. Very intense. Memorial done. cemetary [sic] picked in laurel, bou. |
| March 7, 2009 | 7:57 p.m. | 77 | [Duplicate of above.] |
| March 8, 2009 | 1:00 a.m. | 78 | Wtf? ? I called left a message and left thousands of texts too. I need you to talk to me. I made it this long. I hope ur not lying about this. |

All of these full or partial text messages and the attached photographs were in the nature of privileged communications. Jenkins's interpretation of the text messages was that they were manipulations designed to provoke a response. When

---

**17.** We shall discuss this text and attached content in more detail, *infra.*

each message was sent, Ali remained under Jenkins's care on an emergency basis. Thus, Jenkins's treatment relationship with Ali was in a state of transition, in which Ali was permitted to contact Jenkins "on an emergency basis." Read objectively, the content of each message suggests, in one way or another, that Ali is experiencing a crisis, precipitated by the cessation of contact with Jenkins, in which she is contemplating self-harm. Ali states that the lack of a response is "killing [her]," that she is "[l]osing it," and refers to having chosen a cemetery. She says she feels "sick," that she is having an "episode," and that she is "coding very badly." She begs Jenkins to resume contact with her.

In addition, although some of the text messages do not appear privileged standing alone, when considered in the context of the continuous stream of messages, they take on the characteristics of privileged communications.

For example, shortly before midnight on February 25, 2009, Ali sent Jenkins the photograph depicting herself injecting something into her arm with a hypodermic needle. A little less than an hour later, she texted, stating "Why won't you call? ? I don't get this. You said you will respond. Why won't you keep your word. I always kept mine. I never lied." The content itself would not appear to be a privileged communication, but given that it was sent on the heels of a threat of self-harm, it can be read as a request for Jenkins to respond to that threat as she had promised to do in the Initial Termination Letter and during the Termination Session.

 The patient-psychotherapist privilege is to be construed broadly, to protect and encourage patients to communicate freely and openly with their therapists without fear of such communications being disclosed. *See Laznovsky, supra; In re Alethea, supra.* An objective reading of Ali's communications, that is, what a reasonable person would read them to mean, not what Jenkins, as Ali's therapist, would read them to mean, advances a broad construction of the privilege. We conclude, therefore, with one exception, that the above list of text messages should have been excluded at trial.

■ Despite its otherwise privileged nature, the photograph of Ali with the gun to her head was admissible because Ali waived any objection to its admission. As discussed, the prosecutor displayed the photograph of Ali with a gun to her head during opening statements. Defense counsel did not object and discussed the same photograph during his opening statement. Defense counsel subsequently introduced enhanced versions of the same photograph during cross-examination of Detective Delbusso in an attempt to rebut testimony that the gun was cocked and ready to fire in the photograph. Because the photograph was admitted without objection and already before the jury prior to the court's ruling as to the admissibility of the text messages, we conclude that any argument that it should have been excluded has been waived. The attached text message was not introduced previously, however, and, accordingly, we conclude that the text message itself was privileged.[18]

### F. Muffoletto Email and Modified Muffoletto Email

Ali argues that the trial court should not have accepted into evidence the Muffoletto Email and the Modified Muffoletto Email because doing so violated her privilege under CJP section 9–109. As discussed above, on February 17, 2009, Jenkins emailed Muffoletto expressing concerns about threats of malpractice litigation made by Ali and Ali's father and discussing the course of action she was taking to terminate her therapeutic relationship with Ali (Muffoletto Email). Ali later illegally obtained this email from Jenkins's Hotmail account, copied it into a Microsoft Word document, inserted comments in the text of the email, and emailed the altered document to Jenkins as an attachment (Modified Muffoletto

---

18. The text message stated:
 is this what you want me to do? your purposeful actions show it. does this make you happy? not threatening just asking. tho[ugh]t u needed a visual. If this isn't enough i can send video too. A no reply says u need video. ur the only one that can clear this. Not [ER] or police. It will just continue. Hope u put an end to this before i do. Not threatening

Email). It was upon receiving the Modified Muffoletto Email from Ali, on or about March 6, 2009, that Jenkins discovered that Ali was accessing her business email account without authorization.

We reproduce the relevant portions of the prosecutor's direct examination of Jenkins, below:

[PROSECUTOR]: Who is Mark Muffoletto?

JENKINS: He is a private attorney that I work with.

[PROSECUTOR]: At some point did something unusual occur requiring [sic] an e-mail that you sent to Mr. Muffoletto?

JENKINS: Yes. I received an e-mail from [Ali] stating, ["]I will put more cards on this table. This fell into my lap.["] There is an attachment to it. The attachment was a word document where some of the writing was in black and some of the other writing was in red. It looked familiar to me. So I went back through my e-mails and realized that it was a replica word-for-word of an e-mail that I had sent to my private attorney under private confidential communication just to him. And what I had written to him was in black and what [Ali] had written was in red.

[PROSECUTOR]: I am showing you what has been marked as State's 15 for identification. Can you tell the Court what in fact that is?

JENKINS: Yes. This is an exact copy of the e-mail that I sent to my private attorney Mark Muffoletto.

[PROSECUTOR]: What is the nature of the content of that e-mail? What is it regarding?

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Come on up.

[DEFENSE COUNSEL]: This is a communication from when [Ali] was a patient. This is a communication about [ ] Ali, a patient, either current or former patient of Dr. Jenkins to her lawyer. I agree a person has a right to consult her lawyer all they want.

I think it's a breach of doctor-patient relationship for Dr. Jenkins to communicate to Dr. Jenkins'[s] lawyer regarding

the subject matter of the treatment of—Dr. Jenkins'[s] treatment of [ ] Ali. The attorney-client privilege—the doctor—patient privilege is [ ] Ali's privilege and that privilege trumps the right of Dr. Jenkins to communicate to her attorney.

THE COURT: Anything from the State?

[PROSECUTOR]: No, your Honor.

THE COURT: I have looked at the content of this. There's nothing in here that relates to treatment or communications. This relates specifically to the concerns she is having. So I am going to overrule the objection on that basis.

At the conclusion of the bench conference, the prosecutor was permitted to introduce the Muffoletto Email into evidence. Defense counsel renewed his objection at that time. The prosecutor also was permitted to introduce into evidence the Modified Muffoletto Email, again over defense counsel's objection.[19]

The Modified Muffoletto Email, with bolded portions reflecting Ali's insertions, reads as follows:

Hello, just an update. I made the police report. The officer said he would call the father after he left. I assume he did, I never heard anything else from the father or the officer. The client was ep'd and certified to the psych unit at northwest. [S]he was released the next day. I met with her yesterday to see if we would be able to keep working together. She signed a contract saying she did not have a gun and would work better with me. **I meant that even if you don't think so.**

---

**19.** The State introduced, as exhibits 15A and 15B, the Muffoletto Email and the Modified Muffoletto Email. On cross-examination of Jenkins, defense counsel presented a second version of the Modified Muffoletto Email. The second version showed Ali's insertions appearing in red font. The prosecutor suggested that this version be substituted for Exhibit 15B. Instead, it was marked and admitted as State's Exhibit 15C. The contents of Exhibit 15B and 15C are identical except for the font color.

Today she sent me pictures and text messages that she was injecting herself with drugs and was going to get her gun. "Thank you for my death ..." she wrote. **I was getting worse because you ignoring me, so obviously I will feel worse.**[20] **I knew you probably in sessions all day but needed to know that you know I'm going into an episode I did handle it that day w/o hurting myself at all.** So, I have called the police on her twice tonight. She denied injecting herself and said they were old pictures. She denied intent to harm herself and going to get a gun. The police finally ep'd her so she is now at the er for eval. [H]opefully she will be certified and I will tell staff there that they need to help her find a new therapist to work with. [S]he will be pissed and will probably side with her father to sue me. She just told me the other night that last time I stopped working with her she helped her father prepare a law suite [sic] to the extend [sic] she met with a lawyer and a psychologist and let them prepare paper work to sue me. **That was 6 months ago. I'm not the same person as 6 months ago.** Just before they filed, she said she decided not to go along with them to sue me. **I couldn't do this to you. My dad kept pushing for me to do it the whole time. I was torn. It's totally understandable and valid.** I'm sure when I stop working with her for good this time, she will go forward. **Not true, I am not trying to destroy you I've said that over and over again.** I'm going to try to let her down easy to help prevent her from sueing [sic], but she's obviously determined to make my life hell. **No, I never want you to be miserable or anyone else.** I'll let you know how it goes. Thanks for your help and support. Hopefully we won't have to fight this in court; I just don't need the headache.

 We begin by considering whether this argument is preserved for review. As the State points out, defense coun-

___

**20.** The preceding sentence was not in red font in the exhibit introduced at trial, but Jenkins testified on cross-examination that this also was an insertion by Ali.

sel did not argue that the Muffoletto Email or the Modified Muffoletto Email should be excluded from evidence under CJP section 9–109. Rather, he argued that Jenkins had violated Ali's right to confidentiality in her medical records by communicating information about Ali's treatment to her (Jenkins's) attorney. Once again, it is apparent from the trial court's ruling that the judge understood the real issue to be whether these emails contained privileged communications that would be inadmissible at trial. As this issue was "decided by the trial court," it is properly before us on appeal. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide an[ ] issue unless it plainly appears by the record to have been raised in or decided by the trial court.").[21]

■ For purposes of this case, whether the trial court erred in ruling that the Muffoletto Email and the Modified

---

**21.** At trial, defense counsel frequently confused the issue of confidentiality of medical/mental health records with the issue of privileged communications between a patient and a psychologist or psychiatrist under CJP section 9–109. As noted above, in Maryland medical and mental health records are confidential under HG sections 4–301 *et seq.* HG section 4–305(b)(1) allows a health care provider to disclose a medical record of a patient, including a recipient of mental health services, without the patient or recipient's authorization, to the health care provider's legal counsel for the purpose of representation (subsection ii) or for the purpose of handling a potential or actual claim against the health care provider (subsection iii). The evidence at trial showed that Jenkins was seeking legal advice from Muffoletto, her lawyer, about getting Ali taken to a hospital for an emergency evaluation and about a threatened malpractice claim by Ali. In those circumstances, Jenkins was permitted to disclose Ali's medical records, and therefore to disclose the contents of the records, to Muffoletto. That was the case even though the records were of mental health treatment. HG section 4–307, which covers disclosure of mental health records, provides at subsection (b) that "[t]he disclosure of a medical record developed in connection with the provision of mental health services shall be governed by the provisions of this section *in addition to the other provisions of this subtitle.*" (Emphasis added.) There is nothing in HG section 4–307 that is contrary to HG section 4–305(b)(1).

In addition, HG section 4–307(d) provides that a mental health care provider may maintain "personal notes" about a patient. A "personal note" is not considered part of the patient's medical record if disclosed to the health care provider's private attorney.

Muffoletto Email were not protected by the patient-psycho-therapist privilege depends upon whether the emails contained "[c]ommunications relating to diagnosis or treatment of" Ali. CJP § 9–109(b).

The trial court concluded that the Muffoletto Email was not privileged because its subject was Jenkins's concerns about her therapeutic relationship with Ali and threats of litigation made by Ali. The State argues that the trial court's assessment was correct because the email "did not reveal any fact learned by Dr. Jenkins relating to diagnosis or treatment." We disagree.

As noted, the Muffoletto Email was sent on February 17, 2009. This was three days before Jenkins sent Ali the Initial Termination Letter. Thus, the communications by Ali to Jenkins that Jenkins relayed to Muffoletto in that email necessarily were made while Ali was a patient of Jenkins, and not during the period beginning on February 20, 2009, when Ali was a patient for emergency purposes only. In the context of presenting her concerns to Muffoletto, Jenkins relayed communications Ali had made to her that related to Ali's diagnosis or treatment, and thus were privileged communications under CJP section 9–109(a). Therefore, the Muffoletto Email should not have been admitted into evidence in its unredacted form.[22]

Three statements in the Muffoletto Email relayed communications between Ali and Jenkins that concerned Ali's treatment or diagnosis: 1) In the first paragraph, Jenkins informed Muffoletto that Ali had "signed a contract saying she did not have a gun and would work better with me," thus relaying a communication between Ali and Jenkins concerning prevention of self-harm by Ali. Steps a therapist takes to minimize the risk of a mental health patient inflicting self-harm are central to the patient's treatment. 2) In the second paragraph, Jenkins wrote: "Today she [Ali] sent me pictures and text messages that she was injecting herself with drugs and

---

22. Neither party suggested redaction below.

was going to get her gun. 'Thank you for my death . . .' she wrote." In this statement, Jenkins is relating a communication by Ali threatening self-harm, which, as explained, concerned treatment or diagnosis.[23] 3) In the second paragraph, Jenkins also told Muffoletto that, after Ali sent her the above text message, Ali "denied injecting herself and said they were old pictures" and "denied intent to harm herself and going to get a gun." Although it is not entirely clear whether Ali made these denials to Jenkins or to the police (as the email reflects that Jenkins reported Ali's threats to the police), we must assume for purposes of our analysis that the denials were made to Jenkins. These denials of self-harm by Ali were communications she made to Jenkins relating to her (Ali's) diagnosis or treatment.

In other portions of the Muffoletto Email, Jenkins told Muffoletto about actions she took (calling the police, filing a police report), her concerns about Ali's threats of litigation, and her related concerns about whether terminating the therapeutic relationship might serve to instigate legal action by Ali. We agree with the State and with the trial court that these portions of the Muffoletto Email do not concern Ali's diagnosis or treatment and therefore were not privileged.

■■■ Of course, the Modified Muffoletto Email also contains privileged communications in that it reproduced all of the same statements discussed above. We must determine in addition whether Ali's inserted comments were privileged. The inserted comments were made after the Initial Termination Letter (February 20, 2009), but before the Final Termination Letter (received by Ali no later than March 8, 2009), during the period that Jenkins was serving as Ali's therapist for emergency purposes.

---

23. As discussed above, the trial court excluded from evidence text messages sent by Ali to Jenkins prior to February 20, 2009 (the date of the Initial Termination Letter), on the basis that Ali could have believed them to be communications within the bounds of the therapeutic relationship. The referenced text message had to have been made before February 20, 2009, as the Muffoletto Email was sent by Jenkins on February 17, 2009.

The State argues that "none of Ali's interlineated comments related to diagnosis or treatment. Instead, they were attempts to correct "historical fact[s]." It further maintains that it would be an "abuse of the privilege to apply it to communications unlawfully acquired and edited for the purpose of harassment." It thus urges us to adopt a crime-fraud exception to the patient-psychotherapist privilege.

Two sentences in Ali's inserted comments relate to diagnosis or treatment and thus are privileged communications. In the second paragraph, Ali wrote: "I was getting worse because you ignoring me, so obviously I will feel worse. I knew you probably in sessions all day but needed to know that you know I'm going into an episode I did handle it that day w/o hurting myself at all." Ali inserted these words after Jenkins's description of a text message from Ali that Jenkins interpreted as a threat of self-harm and that prompted Jenkins to contact the police to have Ali taken to a hospital for an emergency psychiatric evaluation. Ali's insertion relates to her treatment and diagnosis in that it specifically comments on an "episode" she was having and the fact that she managed the episode without resorting to self-harm.

Moreover, we decline the State's invitation to adopt a crime-fraud exception to the statutorily created patient-psychotherapist privilege. CJP section 9–109(d) lists six circumstances in which the privilege does not apply. The list does not include a crime-fraud exception. The State has cited no Maryland authority to show that the legislature intended for such an exception to apply and we have found none. The only Maryland case cited by the State, *Newman v. State*, 384 Md. 285, 863 A.2d 321 (2004), concerns the attorney-client privilege, which is codified but originated in the common law. In that case, the Court of Appeals held that a crime-fraud exception applies to attorney-client communications and would "exempt communications seeking advice or aid in furtherance of a crime or fraud, from the protection of the attorney-client privilege." *Id.* at 309, 863 A.2d 321.

The psychotherapist-patient privilege, unlike the attorney-client privilege, was legislatively created. Moreover, the State

does not argue that Ali's interlineated comments are unprivileged because she sought Jenkins's assistance or advice in furtherance of criminal activity; rather, the State argues that the comments are unprivileged because Ali obtained the Muffoletto Email illegally. However wrongfully the email was obtained, Ali attempted to use it as a means of communicating with her therapist.

We hold that the plain language of CJP section 9–109 does not include a crime-fraud exception, and it is not our role to add language to the statute that the legislature could have included but did not. Accordingly, the Modified Muffoletto Email should not have been admitted into evidence without redaction.

### III.

### Is Ali Entitled to a New Trial on All Charges (Except the False Application Charge)?

Ali contends she should be granted a new trial on all counts except the false application count, as the evidence was legally insufficient to support that conviction, because "this Court cannot be satisfied that there is no reasonable possibility that the [improperly admitted] evidence . . . may have contributed to the jury's guilty verdicts." The State responds that we should affirm Ali's convictions on all counts (except for the false application count) because any error by the court in admitting evidence in violation of patient-psychotherapist privilege was harmless beyond a reasonable doubt.

As explained above, the trial court erred in denying Ali's motion for judgment of acquittal on the false application charge and in admitting into evidence the unredacted Muffoletto Email, the Modified Muffoletto Email, and certain text messages from Ali to Jenkins, in violation of the patient-psychotherapist privilege. Obviously, the false application conviction must be flatly reversed with no new trial opportunity. We must determine whether the errors require reversal of all the other convictions. For the reasons to follow, we shall reverse Ali's conviction for harassment but otherwise affirm the remaining convictions.

As the Court of Appeals explained in *Bellamy v. State*, 403 Md. 308, 332–33, 941 A.2d 1107 (2008):

In *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976), we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). As adopted in *Dorsey*, the harmless error rule is:

When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey*, 276 Md. at 659, 350 A.2d at 678.

In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine." *Dykes v. State*, 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990). " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " *Spain v. State*, 386 Md. 145, 175, 872 A.2d 25, 43 (2005) (Bell, C.J., dissenting) (quoting *Ware v. State*, 360 Md. 650, 716–17, 759 A.2d 764, 799 (2000)) (Bell, C.J., dissenting). " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir.1997) (quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)).

■ With respect to the harmlessness *vel non* of the false application charge error, Ali argues that "[t]he jury should not have been allowed to hear and consider evidence about a gun, evidence relating to an allegedly false statement made in a firearm application, evidence about Ali being a danger to herself or to the community, [or] evidence about Ali's psychiatric history." Therefore, this error requires a reversal of all the convictions. We disagree.

The evidence related to the false application charge was admitted without objection and properly was before the jury.[24] The evidence was legally insufficient to support Ali's conviction, however, because it did not demonstrate that she ever had been committed to a mental institution; therefore, she had not made a false representation on her firearm applications. Even if the trial court had granted Ali's motion for judgment of acquittal on the false application charge, the evidence relating to it still would have been presented at trial. Because we perceive no error in the admission of the evidence, we necessarily conclude that its admission cannot be the basis for reversal of Ali's remaining convictions.[25]

Moreover, as the State persuasively argues, the evidence relating to the firearm charge is "easily segregated conceptually from the evidence of intent with which Ali admittedly accessed Dr. Jenkins's email without authorization and stole her identity; the jury was most unlikely to use evidence of the former as evidence of the latter given their distinct conceptual

---

**24.** Ali seems to argue that some of this evidence should have been excluded as being unduly prejudicial, despite its relevance to the charged conduct. This argument was not made below, however, and accordingly was waived.

**25.** We note that Ali did not move to sever this count from the remaining counts. To the extent that Ali's counsel believed that the evidence relevant to the charge of false application should have been inadmissible as to the other charges, severance would have been the appropriate avenue for relief. *See generally, State v. Taylor,* 347 Md. 363, 701 A.2d 389 (1997) (discussing the standard applicable to a motion for severance of offenses).

realms." The prosecutor's closing argument adds strength to this point. After addressing the evidence bearing on each of the charges related to computer access, identity fraud, and harassment, the prosecutor turned to the false application charge. "Then also on your verdict sheet there [is a] charge[ ] that [doesn't] have anything to do with the conduct of [Ali] towards the victim. That's the false information or misstatement on application for firearm on or about December 30th, 2008." The prosecutor went on to describe the specific evidence related to the charge—evidence that was completely divorced from the evidence relevant to the computer access and harassment charges.

For all of these reasons, we conclude that the evidence on which the jury convicted Ali of false application for a firearm was not such as to have affected the jurors' verdicts on the other counts. Therefore, our reversal of the false application conviction does not itself warrant a reversal on the remaining counts.

## A. Illegal Access to Computers

Ali was charged and convicted of thirteen counts of illegal access to computers arising from her unauthorized access of Jenkins's email account. Each count corresponded to a separate date between February 22 and March 8, 2009.[26]

As discussed, *supra,* the prosecution introduced evidence at trial demonstrating that Jenkins's business email account was accessed on at least 74 occasions by IP addresses associated with Ali's home, work, or family computers. The charged counts of illegal access all correspond to dates on which Jenkins's email was accessed by the IP address associated with Ali's home computer.

The trial court instructed the jurors that to convict Ali of illegal access to computers they would need to find that she 1) accessed a computer, 2) without authorization, and 3) her conduct was willful and intentional. In closing argument, the

---

26. The thirteen counts corresponded to February 22–23, 2009, February 25, 2009, and February 27—March 8, 2009.

prosecutor asked the jurors to look to the IP address evidence to assess whether Ali had accessed Jenkins's email account. She emphasized that Ali had acquired the Muffoletto Email, which Jenkins privately had sent to Muffoletto and which never was forwarded or copies to Ali. The prosecutor did not rely upon the content of the Muffoletto Email to prove the illegal access to computers charges. In defense counsel's closing argument, he conceded that Ali had accessed Jenkins's Hotmail account and that she had done so without authorization. He argued that her conduct was not willful because she had a reasonable excuse in that she was "crying out for help."

We have no difficulty in concluding that none of the privileged communications that were admitted erroneously had any bearing on the counts of illegal access to computers. The evidence on these counts was straightforward and discrete. It required nothing more than for the jury to compare the dates on which Ali accessed Jenkins's email account from her home IP address to the dates of each charged count. We conclude that the trial court's errors were harmless beyond a reasonable doubt as to the 12 counts of illegal access to computers.

*B. Unauthorized possession of a computer access code*

Ali was charged and convicted of one count of unauthorized possession of a computer access code. The trial court instructed the jurors that to convict Ali of this count they would have to find that 1) she intentionally and willfully possessed without authorization a computer access code and 2) the access code belonged to Jenkins. As with the charges of illegal access to computers, Ali's counsel conceded in closing argument that she possessed Jenkins's access code without authorization. Only the element of willfulness was contested.

In her closing argument on this count, the prosecutor focused on two pieces of evidence: the IP address records and the papers seized from Ali's home upon execution of the search warrant. The erroneously admitted evidence had no bearing on this charge and, accordingly, for the same reasons discussed, *supra*, we conclude that any error was harmless as to this count, beyond a reasonable doubt.

## C. Identity Fraud

Ali was charged and convicted of one count of identity fraud. This count was based upon Ali's conduct in setting up an AOL email account in Jenkins's name without her authorization. The only evidence relevant to this count were the records subpoenaed from AOL showing that the AOL account was created via Ali's home IP address and testimony from Jenkins that she did not set up the account herself. Ali does not explain how any of the privileged communications could have influenced the jury's verdict on this count. We again conclude that the trial court's errors were harmless beyond a reasonable doubt as to this count.

## D. Violation of a Peace Order

Ali was charged and convicted of three counts of violating a peace order. The three counts corresponded to two dates: June 24 and 25, 2009. As discussed above, Ali consented to the entry of a final peace order. The final peace order was entered on March 19, 2009, and was to remain in effect until September 18, 2009. The peace order stated, in pertinent part, that Ali was not to "contact (in person, by telephone, in writing, or by any other means), attempt to contact, or harass" Jenkins.

The State introduced evidence at trial in the form of telephone records showing that, on one occasion on June 24, 2009, and on two occasions on June 25, 2009, Ali called Jenkins's cell phone. This was the only evidence introduced in support of this charge and the only evidence relied upon by the prosecutor in her closing argument. Defense counsel again challenged only the willfulness element. The trial court's errors were harmless beyond a reasonable doubt as to this count as well.

## E. Harassment

Ali was charged and convicted of one count of harassment. The charged conduct was alleged to have occurred

between February 22, 2009 (the day before the Termination Session), and June 25, 2009.

The trial court instructed the jurors on this count as follows:

In order to convict [Ali] of this offense, the State must prove, first, that [Ali] maliciously engaged in a course of conduct that alarmed or seriously annoyed [ ] Jenkins; second, that [Ali] intended to harass, alarm or annoy [ ] Jenkins; third, that [Ali] did so after receiving a reasonable warning or request to stop the behavior by or on behalf of [ ] Jenkins; and finally, that there was no legal purpose for [Ali]'s behavior.

The prosecutor made the following closing argument as to this count:

Harassment. The judge told you that harassment is conduct that alarmed or annoyed after you were told to stop.

Ladies and gentlemen, this photograph [of Ali with a gun to her head] that was put into evidence by the defense with a text message, that was sent to Dr. Jenkins during those dates. This is nothing more than an attempt to alarm, to annoy. And furthermore, when you take that binder back and you look under text messages, you will find text messages Number 33 through 79, not just a couple of dates.

But you will read the text messages that the defendant sent to Dr. Jenkins, the text message that she was told to stop sending. She was told if you are having an emergency, you need to call 911, you need to go to the hospital, you need to call one of your other service providers, I can't help you anymore. The defendant didn't want to hear that. She wanted to control the situation. She continued to send these text messages. And that, ladies and gentlemen, is by definition harassment. She had other places to turn to and she didn't want to turn to those places. No, she continued to send text messages over and over to the doctor. That is harassment.

Unlike the other charges against Ali, the text messages she sent to Jenkins between February 24 and March 8, 2009, were

central to the State's proof of harassment. We have concluded that the majority of these text messages contained privileged content that should have been excluded from evidence. Because to prove harassment the State was required to show that Ali engaged in a "course of conduct that alarmed or seriously annoyed . . . Jenkins," the content of these text messages, in addition to the sheer number of them, was relevant. Had the jurors been presented only with the admissible text messages, they might not have found the evidence of a "course of conduct" sufficient to warrant a conviction under this count. Therefore, as to the harassment count, the trial court's error in admitting privileged material was not harmless beyond a reasonable doubt. Accordingly, we shall reverse Ali's conviction for harassment.

**JUDGMENT ON CONVICTION OF FALSE APPLICATION TO PURCHASE A REGULATED FIREARM REVERSED. JUDGMENT ON CONVICTION OF HARASSMENT REVERSED AND COUNT REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE–HALF BY BALTIMORE COUNTY.**